[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/17/99
THOMAS K. KAHN
CLERK

No. 96-5491

D.C. Docket No. 95-139-CR-HIGHSMITH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT O. MILLER, JR.,
NINA MILLER, and
ROBERT WOHLLEBER,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(September 17, 1999)**

Before TJOFLAT, BLACK and CARNES, Circuit Judges.

PER CURIAM:

Robert Miller ("Miller"), Nina Miller, his wife, and Robert Wohlleber ("Wohlleber") were convicted in the district court of several offenses arising out of a fraudulent scheme involving letters of credit. They appeal, challenging their convictions and their sentences. We affirm.

## I.

## A.

In the mid-1980s, Leonard Straus, chairman of Thrifty Corporation ("Thrifty") and avid tennis fan, convinced Thrifty's board of directors to invest in Fox Racket Company ("Fox"), a manufacturer of tennis rackets. Straus also assisted Fox's founder, Vernon Beck, in recruiting Miller to join Fox. The result of that recruitment effort was the formation of FTM, a Thrifty subsidiary that would manufacture and market Fox rackets.[1] Miller was elected president of FTM, Wohlleber was hired as national sales manager, and Nina Miller was hired as office manager. As president of FTM, Miller received a salary of $70,000 a year, a bonus incentive, and an ownership interest in FTM. Wohlleber and Nina Miller received salaries, health insurance, and other perks.

---

[1] Subsequently, FTM expanded into other product lines including golf clubs and sporting apparel.

To assist FTM financially, Thrifty allowed FTM to use its Bank of America line of credit. Later, in 1987, Thrifty arranged for FTM to obtain its own line of credit with Bank of America, which Thrifty guaranteed. Originally, FTM's line of credit was for $10 million. That amount was increased to $20 million in 1989 and then to $25 million in 1990. All credit line requests were made by Miller. Initially, Miller requested letters of credit to purchase legitimate merchandise, but once FTM had its own line of credit, Miller began requesting letters of credit for nonexistent merchandise.

Between 1986 and 1991, Miller reported monthly to Thrifty's board and officers that FTM's profits and sales were increasing. In reality, only FTM's debt was rising. Pacific Enterprises ("Pacific"), Thrifty's parent company, discovered this discrepancy in 1991 when it ordered an audit of FTM. At approximately the same time, Pacific received a phone call on its whistle blower hotline reporting that Miller had falsified records. These two incidents led Pacific to initiate an investigation into financial irregularities surrounding FTM.

Pacific's investigators found that Miller had financed FTM using a series of fraudulent applications for letters of credit, bills of lading, and invoices. The scheme worked as follows: Miller would direct Nina Miller and Wohlleber to prepare an application for a letter of credit for one of two companies, Sports

3

Marketing Limited ("SML") and Cactus Golf, on whose bank accounts Miller, Nina Miller, and Wohlleber had authority to write checks.[2] The application would represent that the company wished to sell sporting goods to FTM and that a letter of credit would enable FTM to pay for the goods. Typically, Wohlleber signed the name Kevin Eger, Cactus Golf's owner, to the Cactus Golf application, and Nina Miller signed the name Steve Williams, SML's owner, to the SML application. Wohlleber and Nina Miller then sent the applications to Bank of America. If the bank approved the application, it would mail a letter of credit to the seller.[3] The seller in turn would forward the letter of credit to FTM. After receiving these letters of credit, Wohlleber or Nina Miller would create the invoices and bills of lading, evidencing the sale of (nonexistent) goods by Cactus Golf or SML to FTM, and send them on to the bank. If the bank found no discrepancies, it would disburse the requested funds by wiring them directly into the Miami bank accounts of Cactus Golf or SML.

Miller would then obtain these funds in one of two ways. Sometimes, he would write a check payable to American Diversified Sports, a subsidiary of FTM,

---

[2] At least one additional FTM employee and various bank employees also unknowingly assisted FTM with its fraudulent transactions.

[3] The letters of credit for SML were mailed directly to FTM; the letters of credit for Cactus Golf were sent to its office in Houston, Texas. Both companies maintained bank accounts in Miami, Florida.

on the bank account of Cactus Golf or SML, and then deposit the check in FTM's account. Other times, he would create false invoices showing sales from FTM to Cactus Golf or SML, and write a check on Cactus Golf or SML's bank account payable to FTM in the amount of the invoice. Miller would label these illusory sales "export sales" on FTM's books.

By April 1991, Bank of America had issued 195 letters of credit, all based on false documents, to either SML or Cactus Golf. These letters yielded FTM approximately $90,000,000. FTM and Thrifty, as FTM's guarantor, owed Bank of America $19,021,302 on outstanding letters of credit. FTM owed Thrifty an additional $20,639,757, which represented funds Thrifty, as guarantor, had paid the bank.

## B.

On February 28, 1995, a grand jury in Miami, Florida returned an indictment against Miller, Nina Miller, and Wohlleber. Count one alleged a conspiracy to: (a) make materially false statements for the purpose of influencing a federally insured financial institution in violation of 18 U.S.C. § 1014 (1994); (b) forge bills of lading in violation of 49 U.S.C. § 121 (1994);[4] (c) execute a scheme to defraud and

---

[4] This provision was amended July 5, 1994, and is now codified at 49 U.S.C. § 80116 (1994).

obtain monies from a federally insured financial institution in violation of 18 U.S.C. § 1344 (1994); and (d) commit wire fraud in violation of 18 U.S.C. § 1343 (1994). In addition, the indictment contained nine counts of making false statements to a bank, ten counts of preparing false bills of lading, twenty counts of bank fraud, and twenty counts of wire fraud. The indictment also charged Miller individually with ten counts of money laundering in violation of 18 U.S.C. § 1956 (1994).

A jury trial commenced on April 29, 1996. After six days of deliberating, the jury convicted Miller of all 70 counts; Nina Miller of two counts of making false statements to a bank, eight counts of bank fraud, and eight counts of wire fraud;[5] and Wohlleber of the conspiracy count, five counts of making false statements to a bank, eight counts of making false bills of lading, ten counts of bank fraud, and ten counts of wire fraud.

Nina Miller and Wohlleber were sentenced on November 7, 1996; Miller was sentenced on November 22, 1996. Nina Miller received prison sentences totaling 33 months,[6] a five-year term of supervised release, and a $900 fine.

---

[5] The jury was unable to reach a verdict as to the conspiracy count and three counts of making false statements to a bank. Nina Miller was acquitted of the remaining charges.

[6] In determining Nina Miller's base offense level, the district court found that $1,939,660 in letters of credit that were unpaid on March 31, 1991 were directly attributable to her conduct.

6

Wohlleber was sentenced to prison for a total of 51 months, fined $1,700, and given a five-year term of supervised release. Miller received prison sentences totaling 168 months, a five-year term of supervised release, and a $3,500 fine.

As noted above, in their appeals, the appellants challenge both their convictions and their sentences. We find the challenges to their convictions, which are set out in the margin,[7] devoid of merit; we thus affirm their convictions without further discussion.[8] With one exception, which we discuss in part II below, we affirm their sentences without discussion.[9]

## II.

With the exception of Miller's money laundering convictions, all of the

---

[7] Appellants challenge their convictions on the following grounds: (1) the evidence was insufficient to convict Wohlleber; (2) the district court's supplemental instructions to the jury (in response to a jury question) were unbalanced; and (3) the district court abused its discretion in several evidentiary rulings. These rulings involved (a) the court's exclusion of a Pacific Enterprises' internal audit report; (b) the court's admission of statements made by Miller under the terms of a settlement agreement with Thrifty; (c) the court's refusal to allow Miller to present certain evidence and pursue various lines of inquiry; (d) the court's admission of Richard Eils' deposition into evidence; (e) the court's admission of James Ukropina's statement into evidence; and (f) the court's questioning of witness Steve Williams.

[8] See 11th Cir. R. 36-1.

[9] Miller claims that the court erred in increasing his base offense level by four levels for his role as a leader or organizer of the fraudulent letter-of-credit scheme. Nina Miller contends that her crime was victimless. Wohlleber claims that the court erred in refusing to grant a downward departure from the guideline sentence range based on his post-offense rehabilitation. We affirm appellants' sentences without discussing these challenges because we find the challenges meritless. See 11th Cir. R. 36-1.

7

appellants' offenses are governed by Sentencing Guidelines section 2F1.1.

Miller's money laundering offenses are governed by Sentencing Guidelines section

2S1.1.

Under section 2F1.1, a defendant's base offense level is determined by the

amount of the victims' loss. The victims in this case are Bank of America and

Thrifty; their losses are calculated as of March 31, 1991, the day on which the

fraud was discovered (a point that appears undisputed). The district court

calculated the victims' combined loss at $39,661,059. Of that amount,

$19,021,302 represents the letters of credit outstanding to Bank of America when

the fraud was discovered on March 31, 1991. The rest, $20,639,757, represents the

amount FTM owed Thrifty on fraudulent letters of credit Thrifty reimbursed the

bank as FTM's guarantor. To arrive at $20,639,757, the court applied a straight

composite average[10] of .748 to the amount FTM owed Thrifty on all letters of

credit, $27,593,258.

The district court's loss calculation only affected Wohlleber's sentences.

Miller's offenses were grouped into two groups: group I consisted of the money

laundering counts and group II consisted of the remaining counts. See U.S.

_____

[10] The Government proposed a weighted average in lieu of a straight composite average, but the district court rejected its approach as too speculative. The Government's calculations yielded an intercompany debt of $22,146,349 and a total loss of $41,167,651.

Sentencing Guidelines Manual § 3D1.4 (1998).   The offense level for group I was 35 and, given Miller's criminal history category of I, yielded a sentence range of 168 to 210 months imprisonment.  This range was higher than the level 28 range associated with the group II convictions.  Accordingly, after sentencing Miller to a total of 168 months imprisonment for the group I offenses, the court sentenced Miller on the group II counts to consecutive prison sentences totaling 168 months,[11] which were to run concurrently with the group I sentences.

This court reviews findings of fact on sentencing matters for clear error.  See United States v. Miller, 166 F.3d 1153, 1155 (11th Cir. 1999).  The district court found the total amount of loss to be $39,661,059.  This figure represents the amount outstanding to Bank of America and Thrifty on March 31, 1991— which, as noted above, was the date the defendants' fraud was discovered.  None of the appellants seriously disputes the court's calculation of the amount outstanding to the bank:  $19,021,302.  The appellants do, however, challenge the district court's calculation of the amount outstanding to Thrifty.

Appellants argue that the court double counted letters of credit when calculating FTM's debt to Thrifty.  This is untrue.  The court found, based on intercompany debt reports, that the total amount FTM owed Thrifty for letters of

_____

[11] The sentences for Miller's group II offenses ranged from 24 to 60 months.

credit was $27,593,258. The court could not precisely calculate the amount of this figure attributable to fraudulent letters of credit for two reasons. First, much of the documentation relating to these transactions was missing. Second, FTM frequently did not indicate on its payments (to Thrifty) which letters of credit were being repaid. Therefore, the court had to estimate what percentage of $27,593,258 the fraudulent letters of credit encompassed.

Basing its calculations on Bank of America's documents, the court determined the percent of fraudulent letters of credit outstanding for each quarter from September 1986 until March 1991. In turn, the court determined the average of those percentages (74.8%) and applied that number to the $27,593,258 that was outstanding to Thrifty on March 31, 1991. Although the result ($20,639,757) was not precise, it was reasonable. The sentencing guidelines recognize that often the amount of loss caused by fraud is difficult to determine accurately. Thus, courts may reasonably estimate that amount. See U.S. Sentencing Guidelines Manual § 2F1.1 commentary n.9 (1998) ("For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."); see also United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993). Given the little information available to it, the district court's estimation of the loss defendants' fraud caused Thrifty,

Pacific, and Bank of America was reasonable.  In sum, we affirm the district court's finding that the loss to Thrifty and Pacific was $20,639,757; the loss to Bank of America was $19,021,302; and the total loss was $39,661,059.

## III.

Appellants' convictions and sentences are

AFFIRMED.