[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-13536

_____

D.C. Docket No. 98-00063-CR-RV-3

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 20, 2001
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

JOHN T. RENICK, HOLLY W. BUTCHER,

Defendants-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(November 20, 2001)**

Before CARNES and MARCUS, Circuit Judges, and PROPST[*], District Judge.

PER CURIAM:

On July 15, 1998, Holly W. Butcher ("Butcher") and John T. Renick

_____

[*] Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

("Renick") (collectively "appellants") were indicted in a thirty-eight count indictment. Count One charged Butcher and Renick with conspiracy to defraud the United States by impeding the administration of health care programs and by submitting false claims to CHAMPUS, Medicare, and other such programs, 18 U.S.C. § 287 (1994); to commit wire fraud, 18 U.S.C. § 1343 (1994); and to commit money laundering, 18 U.S.C. § 1956 (1994). Counts Two through Fifteen each charged both appellants with, on various dates, committing wire fraud by wire transmission of fraudulent claims from Florida to CHAMPUS in Wisconsin. Counts Sixteen through Twenty-Eight each charged both appellants with, on various dates, money laundering offenses relating to alleged wire and mail fraud regarding checks deposited in a Ft. Walton Beach, Florida bank which were drawn by CHAMPUS on an Indiana bank, 18 U.S.C. §§ 1341 and 1343 and 18 U.S.C. §§ 1956(a)(1)(A)(i)-1956(a)(2) (1994). Counts Twenty-Nine through Thirty-Eight each charged both appellants with money laundering, on various dates, involving checks to Renick drawn on a Vendell Healthcare, Inc. bank account in Tennessee and deposited in Renick's account in a Florida bank, 18 U.S.C. §§ 1956(a)(1)(A)(i)-1956(a)(2) (1994).

At trial, at the close of the Government's case, the appellants moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal

Procedure.  The district court reserved ruling on the motions until after the jury returned its verdicts, but indicated that it was inclined to grant the motions.  The jury convicted both Butcher and Renick of all thirty-eight counts.  The next day, after the return of forfeiture verdicts, the district court granted judgments of acquittal of both appellants as to all counts. The United States appealed the judgments of the district court and, on November 24, 1999, another panel of this court, in an unpublished opinion which is attached hereto as an appendix, reversed the judgments and instructed the district court to reinstate the jury verdicts on all counts as to both appellants.  The district court sentenced both appellants and this appeal followed.

Butcher raises the following issues on this appeal:

(1) Whether Rule 29(b) of the Federal Rules of Criminal Procedure, as applied in this case, is unconstitutional as a violation of the Double Jeopardy Clause.

(2) Whether the district court abused its discretion by failing to rule on the motion for judgment of acquittal until after the return of the jury verdicts.

(3) Whether there was a denial of due process because the prosecution was based on federal regulations that failed to give fair warning of the conduct they prohibit or require.

(4) Whether the district court erred by not requiring the Government to set forth in a bill of particulars the false statements charged.

(5) Whether the district court erred under Rule 403 of the Federal Rules of Evidence in admitting a portion of a CHAMPUS manual and related testimony.

(6) Whether the district court erred by concluding that it lacked jurisdiction to grant a motion for new trial.

(7) Whether the district court erred, for sentencing purposes, in determining the loss and in determining that there was more than minimal planning.

Renick has adopted the same issues raised by Butcher.

On cross-appeal the Government argues that the loss amount used by the district court at sentencing was too low.

RULE 29(b) ISSUES

Rule 29(b) of the Federal Rules of Criminal Procedure provides:

> The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

In this case, the trial judge, after the Government rested, expressed an "inclination" to grant the appellants' motions for judgment of acquittal. He stated,

4

however, that he would "take all of this under advisement for a little while longer . . . but we will proceed for right now." The appellants rested without putting on any evidence. The reasonableness of the district court's ambivalence was borne out by the reversal by this court of the granted judgments of acquittal. It would be entirely inconsistent for this court to now say that, by hesitating, the district court abused its discretion.

The appellants have not cited any cases that have held Rule 29(b) to be unconstitutional, either facially or as applied. Freer v. Dugger, 935 F.2d 213 (11th Cir. 1991), cited by the appellants, was a habeas case involving a conviction in a Florida court. The state trial court had "ruled" that it would set aside a verdict of guilty based upon insufficiency of evidence. Id. at 215. When the State requested that the trial judge treat the ruling as a motion for new trial so that the State could appeal the decision, the trial judge agreed to do so, but stated "I will grant the motion for a new trial, because I'm not satisfied the evidence proves guilt beyond every reasonable doubt . . . ." Id. On appeal, the granting of the new trial was affirmed. Id. The habeas petitioner was convicted after another trial. Id.

The United States District Court for the Northern District of Florida granted the habeas petition, holding that the Double Jeopardy Clause barred the petitioner's retrial. Id. at 216. On appeal, this court affirmed the judgment of the district court,

5

holding that the substance of the state trial court's ruling was that the evidence was insufficient to establish guilt beyond a reasonable doubt and that the Florida appellate court had not determined that the substantive ruling of insufficiency was in error.  Id. at 222.

Freer is clearly distinguishable.  First, the only authoritative holding(s) at any level in Freer were that the evidence in the first trial was insufficient to establish guilt beyond a reasonable doubt.  Id.  Second, after the first decisive rulings, the defendant in Freer had to stand trial again.  Id. at 215.  In this case, while the district court's post-verdict rulings were clear rulings that the evidence was insufficient, this court clearly reversed those rulings.  The appellants were not exposed to another trial after a final ruling of insufficiency as was the Freer defendant.  The verdicts in the first, and only, trial were merely reinstated.

Another case that the appellants cite on the double jeopardy issue is United States v. Martin Linen Supply Co., 430 U.S. 564 (1977).  That case is also clearly distinguishable.  The essence of the Supreme Court's ruling was that a judgment of acquittal granted by a district court after a mistrial was not appealable, and thus final, because a reversal on appeal "would enable the United States to try respondents a second time . . . ."  Id. at 567.  The distinction is made vivid in the Advisory Committee Notes to Rule 29, which state:

6

The amendment also permits the trial court to balance the defendant's interest in an immediate resolution of the motion against the interest of the government in proceeding to a verdict thereby preserving its right to appeal in the event a verdict of guilty is returned but is then set aside by the granting of a judgment of acquittal. Under the double jeopardy clause the government may appeal the granting of a motion for judgment of acquittal only if there would be no necessity for another trial, i.e., only where the jury has returned a verdict of guilty. United States v. Martin Linen Supply Co., 430 U.S. 564 (1977). Thus, the government's right to appeal a Rule 29 motion is only preserved where the ruling is reserved until after the verdict.

In addressing the issue of preserving the government's right to appeal and at the same time recognizing double jeopardy concerns, the Supreme Court observed:

We should point out that it is entirely possible for a trial court to reconcile the public interest in the Government's right to appeal from an erroneous conclusion of law with the defendant's interest in avoiding a second prosecution. In United States v. Wilson, 420 U.S. 332 (1975), the court permitted the case to go to the jury, which returned a verdict of guilty, but it subsequently dismissed the indictment for preindictment delay on the basis of evidence adduced at trial. Most recently in United States v. Ceccolini, 435 U.S. 268 (1978), we described similar action with approval: "The District Court had sensibly made its finding on the factual question of guilt or innocence, and then ruled on the motion to suppress; a reversal of these rulings would require no further proceeding in the District Court, but merely a reinstatement of the finding of guilt." Id. at 271.

United States v. Scott, 437 U.S. 82, 100 n.13 (1978). By analogy, reserving a ruling on a motion for judgment of acquittal strikes the same balance as that reflected by the Supreme Court in Scott. See also White v. Wainwright, 809 F.2d 1478 (11th Cir. 1987).

We conclude that the appellants' constitutional and abuse of discretion

arguments regarding the Rule 29(b) reservations have no merit.

## LACK OF DUE PROCESS FOR
## FAILURE OF FAIR WARNING

Appellants argue that, "[t]hus, the issue becomes whether or not the

defendants can be criminally prosecuted for violations of ambiguous regulations

consistent with due process." On the first appeal this court considered a similar, if

not identical, argument. The opinion in that case stated, <u>inter</u> <u>alia</u>,

> In its written order . . . the [district] court concluded that the evidence
> was not sufficient to support a finding of intent on any count.
> Specifically, the trial court found that . . . (2) "with respect to the
> Champus counts, the government failed to negate the defendants'
> proffered 'reasonable interpretation' of the Champus regulations as
> allowing the hospitals to bill CHAMPUS on a <u>per</u> <u>diem</u> basis even if
> the patients were treated by Renick."[1]

Appellants now argue, "In the instant case, the government's witnesses cited no

regulation where an individual provider such as Dr. Renick was excluded from

participation in Medicare and CHAMPUS and yet provided in-home services that

were included in a flat per diem figure or Part A Medicare paid to an institution

which was not so excluded." This court's earlier opinion stated, "Moreover, in

---

[1] The district court also suggested that this is not the type of Medicare or CHAMPUS
case that the government should be prosecuting because there is no claim that the government
was billed for services that were not rendered, and "it attempts to criminalize a violation of the
regulations and policies of government agencies." (note in original appellate opinion).

8

order to charge a <u>per</u> <u>diem</u> rate, the CHAMPUS regulations require a physician's

services.  32 C.F.R. 199.4(c) . . . . "

In its December 7, 1998 order granting the appellants' motions for judgments of acquittal, the district court discussed the issue of the purported ambiguity of the regulations extensively.  The purported inability of the appellants to interpret these regulations was a substantial basis for the district court's granting the judgments of acquittal, which were reversed.  At least by implication, this court has previously rejected the appellants' argument.

The appellants were not convicted of violating regulations.  They were convicted of violating the above-referenced statutes.  Specifically, the jury was instructed that violations of the regulations did not amount to criminal conduct.  The jury was instructed:

> You have heard evidence concerning federal health program regulations that the defendants have allegedly violated.  The defendants have not been charged in this case with violating such regulations, and any such violation on the part of the defendant is not a criminal offense for purposes of this case.
>
> To the extent Count One charges that the defendants conspired to present fraudulent claims to the Medicare and CHAMPUS federal insurance programs, and that Counts Two through Fifteen charge the defendants with causing wire transmissions of fraudulent claims to be sent to CHAMPUS, you must determine whether the defendants' acts were in violation of the regulations governing those programs.
>
> Regulations that are complex and difficult to interpret pose a danger

9

of ensnaring persons engaged in apparently innocent conduct.

Therefore, as to the objects of the conspiracy or the wire fraud charges involving such regulations, the government must prove beyond a reasonable doubt that the defendant under consideration knew that his or her actions violated the applicable Medicare or CHAMPUS regulations.

At issue in this case are the regulations concerning Medicare and CHAMPUS, both of which are federal health-care programs. Where regulations such as those involved here are ambiguous, the burden is on the government to prove beyond a reasonable doubt that the defendants' interpretation of those regulations were [sic] unreasonable in light of all the circumstances.

Even assuming that the issue is not foreclosed by the law of the case, we find no merit to the appellants' "unfair warning" issue.

BILL OF PARTICULARS

We conclude that this issue has no merit. The Government complied with the order of the district court for a bill of particulars. The appellants were clearly advised, by the indictment, discovery, and the bill of particulars as filed, of what they were called upon to defend. See United States v. Anderson, 799 F.2d 1438, 1441 (11th Cir. 1986). The essence of the charges is stated in the indictment under Manner and Means in Count One, where it is alleged:

(1) It was part of this conspiracy that Holly W. Butcher, as Administrator, and John T. Renick, as Medical Director of Rivendell of Bay County, knowing that Renick had been excluded from the Medicare program, caused Rivendell of Bay County to fraudulently bill Medicare via services for patients and year-end cost reports for

10

services Renick performed as Medical Director of Rivendell of Bay County.

(2) It was further part of this conspiracy that Holly W. Butcher contracted with John T. Renick to be Medical Director for Rivendell of Fort Walton Beach, knowing that Renick had been excluded from federal insurance programs as specified herein, and caused Rivendell of Fort Walton Beach to fraudulently bill federal insurance programs for services Renick performed as treating psychiatrist for federally insured patients.

(3) It was further part of this conspiracy that Holly W. Butcher contracted with a psychiatrist, the stated purpose of which contract was to perform services for its facilities for a fee, when in fact the monies paid to the psychiatrist via the contract were illegal payments in return for federally insured patient referrals rather than for the services specified in the contract.

These allegations are followed with numerous allegations of overt acts which emphasize the fact that the claims that were submitted to the health care programs fraudulently claimed reimbursement for fees paid to appellant Renick during a period when he was excluded from participation. These alleged overt acts include:

(1) On or about September 28, 1994, Holly W. Butcher and others submitted by mail a cost report to Medicare which fraudulently claimed reimbursement for professional fees paid to John T. Renick during Renick's exclusion from the Medicare program.

(2) Between on or about December 5, 1993, through on or about December 16, 1993, Holly W. Butcher, John T. Renick and others admitted and treated at Rivendell of Bay County a patient whose treatment costs were covered by Medicare, but who received treatment from Renick during his exclusion from the Medicare program. The defendants caused claims to be submitted to Medicare for the services provided by Renick.

11

(3) Between on or about July 1, 1993, through on or about July 9, 1993, Holly W. Butcher, John T. Renick and others admitted and treated at Rivendell of Bay County a patient whose treatment costs were covered by Medicare, but who received treatment from Renick during his exclusion from the Medicare Program. The defendants caused claims to be submitted to Medicare for the services provided by Renick.

. . . .

(5) Between on or about February 16, 1995, through on or about March 31, 1995, Holly W. Butcher, John T. Renick and others admitted and treated at Rivendell of Fort Walton Beach a patient whose treatment costs were covered by CHAMPUS, but who received treatment from Renick during his exclusion from the CHAMPUS program. The defendants caused claims to be submitted by mail to CHAMPUS for the services provided by Renick.

(6) Between on or about February 20, 1995 through on or about March 31, 1995, Holly W. Butcher, John T. Renick and others admitted and treated at Rivendell of Fort Walton Beach a patient whose treatment costs were covered by CHAMPUS, but who received treatment from Renick during his exclusion from the CHAMPUS program. The defendants caused claims to be submitted by mail to CHAMPUS for the services provided by Renick.

(7) Between on or about March 1, 1995, through on or about March 31, 1995, Holly W. Butcher, John T. Renick and others admitted and treated at Rivendell of Fort Walton Beach a patient whose treatment costs were covered by CHAMPUS, but who received treatment from Renick during his exclusion from the CHAMPUS program. The defendants caused claims to be submitted by mail to CHAMPUS for the services provided by Renick.

In its written order granting the motions for judgments of acquittal, the district court stated:

12

The essence of the charges against the defendants is that they . . . fraudulently billed federal health insurance programs for medical services performed by Dr. Renick, a psychiatrist . . . . The indictment charges that the defendants caused claims to be submitted on behalf of the Rivendell facilities to CHAMPUS and Medicare for services performed even though the defendants were aware that Renick was excluded from these programs.

The charges were clear in the indictment and clear to the district court. The appellants were clearly advised of what they were called upon to defend. The opening statements of the appellants' attorneys reflect that they knew what the charges were. Appellant Butcher's attorney repeatedly referred to the simplicity of the issue(s). Appellant Renick's attorney emphasized that his client knew that bills for his services were not to be submitted for federally insured patients.

We find no merit as to this issue.

## CHAMPUS MANUAL

Appellants' primary argument is that the admission of a portion of the manual could have confused the jury by suggesting that a defendant could be found guilty by reason of a violation of a regulation contained in the manual. We have addressed this with regard to appellants' third issue and find no merit in this similar argument.

## MOTION FOR NEW TRIAL JURISDICTION

13

The jury returned its verdicts of guilty of the offenses charged in the indictment on November 18, 1998. On November 19, 1998, the jury returned verdicts of forfeiture. On November 19, 1998, after the jury returned forfeiture verdicts, the district court stated as follows:

> Previously I announced to you that it was my inclination to grant a judgment of acquittal for both defendants on all counts, and I want to announce that having taken that under advisement under Rule 29, a judgment of acquittal will be entered for both defendants. This does allow the government to take an appeal. . . . I will follow up with a written order. (emphasis added).

The written order granting the motions for judgments of acquittal on all counts as to both defendants was filed on December 7, 1998. The Government filed its notice of appeal on December 8, 1998. Neither appellant filed a motion for new trial within seven days of either the guilty verdicts or the forfeiture verdicts. The district court did not, within said seven days, fix any other date(s) for the filing of such motion(s). See Fed. R. of Crim. P. 33. In neither its oral statement of November 19, 1998, nor in its written order of December 7, 1998, did the district court make mention of "any motion for new trial . . . ." See Fed. R. of Crim. P. 29(d). The mandate of the Eleventh Circuit Court of Appeals, after the reversal of the district court judgments, was filed on February 17, 2000. Appellant Butcher filed a motion for new trial on February 23, 2000. Appellant Renick filed a motion for new trial on February 28, 2000. Both appellants contend that their motions

14

were timely filed. They argue that until this court issued its mandate on February 17, 2000, reinstating the guilty verdicts, the time for appellants to file motion(s) for a new trial was tolled. February 17, 2000 was on a Thursday. February 21, 2000 was President's Day. Seven days after February 17, 2000 would have ended on February 29, 2000. The motions were timely if the time is calculated from February 17, 2000. See Fed. R. of Crim. P. 45(a).

On May 12, 2000, the district court orally announced that it would grant new trials for both appellants. The Government filed a notice of appeal on May 12, 2000.[2] On May 24, 2000, the district court conducted a telephone conference with the attorneys for all parties and announced the following:

> But I need to tell you that I was operating under a small error in my determination of what Rule 33 required because I was thinking that Rule 33's amendment effective December 1st of 1998 somehow affected what we were doing, but after I got through reviewing all the transcripts and everything, I have had occasion to go back and look at Rule 33 in more detail and I realize that I was mistaken. The effect of that is that I have concluded that even though I think the defendants in the interest of justice are entitled to a new trial, that I do not have jurisdiction to grant their motion. So because of that, the rule . . . the motions are gonna have to be denied. And my order will say that.

On May 24, 2000, the Government filed a "Withdrawal of Notice of [the] Appeal [which was filed on May 12, 2000]." There is a district court docket entry

---

[2] The notice of appeal was filed "pursuant to Title 18 U.S.C. § 3742." Presumably, the Government intended to take the appeal pursuant to Title 18 U.S.C. § 3731 (1994).

15

which says that "The [May 12, 2000] appeal filed by the pltf. USA was never submitted to the USCA for processing."

On June 2, 2000, the district court filed a written order which stated, in substantial detail, why the court thought that the defendants were entitled to a new trial. The court concluded, however, that it could not grant the new trial because the defendants' motions were untimely filed. The district court based this determination on the case of United States v. DiBernardo, 880 F.2d 1216 (11th Cir. 1989).[3]

The appellants contend that, "Thus, as of November 19, 1998 the verdict of guilty had been set aside. There was no verdict of guilty within the context of the Rule 33 for which to file a motion for new trial." The appellants summarize,

> The precise issue before with [sic] this court appears to never have been squarely addressed in any previous decision. The issue in this case is whether or not there is a "guilty verdict" for purposes of Rule 33's time computation where the judge grants a motion for judgment of acquittal on the day the jury verdict is received until such time as an appellate court reinstates the guilty verdict. . . . Here, there was no "verdict" to file a motion for new trial [sic] for because [sic] the court set the "verdict" of the jury aside on the very day the jury was discharged. The verdict was not reinstated until the mandate from the court of appeals was issued.

The Federal Rules of Criminal Procedure at issue include the following:

---

[3] Coincidentally, the opinion in DiBernardo was authored by the same district judge who tried this case, while sitting with the Eleventh Circuit.

16

(1) <u>Rule 47.  Motions</u>:  An application to the court for an order shall be by motion.  A motion other than one made during a trial or hearing shall be in writing unless the court permits it to be made orally.  It shall state the grounds upon which it is made and shall set forth the relief or order sought.

(2) <u>Rule 29(b).  Reservation of Decision on Motion</u>:  The court may reserve decision on a motion for judgment of acquittal . . . and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty . . . .

(3) <u>Rule 29(d).  Same:  Conditional Ruling on Grant of Motion</u>: If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether <u>any motion for a new trial</u> should be granted if the judgment of acquittal is thereafter vacated or reversed . . . ." (emphasis added). [Rule 29(d) thereafter repeatedly refers to <u>motion</u> for new trial and the effect of subsequent review on appeal.]

The commentary to the 1966 Amendments to Rule 29 states:

Reference in the original rule to the motion for a new trial as an alternate to the motion for judgment of acquittal and to the <u>power of the court to order a new trial</u> have been eliminated.  Motions for new trial are adequately covered in Rule 33.  Also the original wording is subject to the interpretation that a motion for judgment of acquittal gives the court power to order a new trial even though the defendant does not wish a new trial and has not asked for one.  (emphasis added).

(4) <u>Rule 33.  New Trial</u>:  <u>On a defendant's motion</u>, the court may grant a new trial to that defendant if the interests of justice so require. . . .  A motion for new trial based on any other grounds [other than newly discovered evidence] may be made only within 7 days after the verdict . . . of guilty or within such further time as the court may fix during the 7-day period.  (emphasis added).

The commentary to the 1966 Amendments to Rule 33 states, "The

amendments to the first two sentences make it clear that a judge has no power to order a new trial on his own motion, that he can act only in response to a motion timely made by a defendant.  Problems of double jeopardy arise when the court acts on its own motion.  See United States v. Smith, 331 U.S. 469 (1947)."

Not directly applicable, but perhaps significant, is the following commentary to the 1998 Amendments to Rule 33:

> As currently written, the time for filing a motion for new trial on the ground of newly discovered evidence runs from the "final judgment."  The courts, in interpreting that language, have uniformly concluded that the language refers to the action of the Court of Appeals.  It is less clear whether that action is the appellate court's judgment or the issuance of its mandate.  In Reyes, the court concluded that it was the latter event . . . .

> It is the intent of the Committee . . . [to use] the trial court's verdict as the triggering event.  The change also furthers internal consistency within the rule itself; the time for filing a motion for new trial on any other ground currently runs from that same event.

(internal citation omitted).  There has been no suggestion that the appellants' motions for new trial filed in February 2000 were based upon allegation(s) of newly discovered evidence. The motions as filed do not list any such ground(s). Thus the seven-day limit prescribed by Rule 33 is the applicable provision.

There is no question that the seven-day time limit provided for in Rule 33 is jurisdictional.  In United States v. Bramlett, 116 F.3d 1403, 1405 (11th Cir. 1997), this court stated,

18

> The time limits imposed by Rule 33 are jurisdictional. . . . District Courts therefore lack jurisdiction to grant a new trial using the interest of justice standard unless the motion is filed within seven days after <u>return</u> of the guilty verdict or within any extension granted by the trial judge within the seven-day period.

(internal citations omitted) (emphasis added). <u>Bramlett</u> held that a district court does not have the power to cause a petition for reconsideration, filed beyond the seven-day limit, of a previously denied, timely filed motion for new trial to be considered as a "renewed" motion for new trial that relates back to the timely filing. <u>Id.</u> at 1406. Among the cases cited in <u>Bramlett</u> is <u>United States v. Hall</u>, 854 F.2d 1269, 1271 (11th Cir. 1988) (holding that the district court had no power to regard an untimely motion for new trial as a supplement to a timely motion).

<u>DiBernardo</u> also held, "The time limits of Rule 33 are jurisdictional . . . ." 880 F.2d at 1223 (citing <u>Hall</u>, 854 F.2d at 1271 and <u>United States v. Brown</u>, 587 F.2d 187, 189 (5th Cir. 1979)). Further, the <u>DiBernardo</u> court stated: "Thus, a district court is without jurisdiction to grant a new trial using the 'in the interest of justice' standard unless the motion is filed within seven days after return of the guilty verdict or within any extension of that time granted by the trial judge within the seven-day period." <u>Id.</u> (internal citations omitted). However, neither party has cited, nor has this court found, a case which addresses the exact issue raised here: that is, whether the seven-day period for filing a motion for new trial is tolled

19

during a period between the grant of judgment of acquittal and the issuance of a mandate reversing the grant of judgment of acquittal, particularly when the grant of judgment of acquittal comes before the seven-day period for filing a motion for new trial expires.

While this specific matter is one of first impression in this Circuit and, apparently, in any federal court at any level, we are not without guidance. First, Rule 33 itself very plainly states that motions for new trial of the nature under consideration here "may be made <u>only</u> within seven days after the verdict . . . of guilty or within such further time as the court may fix <u>during</u> the 7-day period."[4] (emphasis added). Further, this court has stated, in both <u>Bramlett</u> and <u>DiBernardo</u>, that the seven days begins after the <u>return</u> of the guilty verdict. The mandate issued by this court after the first appeal did not result in a "return" of guilty verdict(s). There has been only one date of a return of guilty verdict(s). The jury verdict is obviously the verdict contemplated by the rule.[5]

---

[4] Neither district courts nor this court have the authority to allow motions for new trial to be filed beyond the seven-day limit. <u>See</u> <u>Carlisle v. United States</u>, 517 U.S. 416, 419-33 (1996) (stating that District Court had no authority to grant petitioner's motion for judgment of acquittal filed one day outside the Rule 29(c) seven-day limit even if not filed because of attorney error and even if district court opined that refusal to hear the motion "would result in grave injustice").

[5] <u>See</u> <u>also</u> <u>United States v. DeRocco</u>, 320 F.2d 58 (6th Cir. 1963). It is not necessary for this court to decide whether the crucial date is November 18, 1998 (the date of the guilty verdicts), or November 19, 1998 (the date of the forfeiture verdicts), or December 7, 1998 (the date of the district court's written order consistent with its November 19, 1998 statement) because the subject motions for new trial were not filed within seven days of any such date.

The appellants argue that, "Analysis of the cases relied upon by this court in the DiBernardo decision [and the Bramlett decision] not only reveals that this issue was not decided by any of the decisions, but there is dicta to suggest that the filing of an appeal tolls the running of the seven day period." The cases cited in Bramlett and DiBernardo, however, clearly stand for the proposition that the seven-day limit is jurisdictional.

The "dicta" relied upon by the appellants is in United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978), in which the appellate court affirmed the denial of the appellant's second motion for a new trial "on the basis of Judge Rubin's (sitting as district judge by special designation) order . . . appended hereto." In Beasley, the district court stated:

> Rule 33 provides that a motion for new trial, on any ground other than newly discovered evidence, shall be made within seven days of the verdict or finding of guilty. Because seven days have long passed, even as tolled by the filing of an appeal, the sole basis for the present motion must be newly discovered evidence.

Id. at 339. We are unable to fathom why the quoted "tolled by" statement appeared in Beasley. It is not supported by any cited authority and appears to be contrary to the holding in United States v. Smith, 331 U.S. 469 (1947). In Smith, the Supreme Court stated that "[t]he power of the District Court to make . . . [an] order [granting

21

a new trial] turns entirely on the Rules of Criminal Procedure . . . ." Id. at 471.[6]

Smith further states, "After remand of his case he made no further motion for a new trial and could make none." Id. at 473. Appellants have not cited any support for their argument other than the isolated, unsupported dicta in Beasley.

The appellants were not precluded from filing a motion for new trial by the order(s) granting judgments of acquittal. It is not unusual for there to be motions for judgments of acquittal and conditional motions for new trial. The grant of the motions for judgments of acquittal in this case did not change the date of the return of the guilty verdicts whether that grant occurred on November 18 or December 7, 1998. A motion for new trial could have been filed within seven days of at least one of those dates, conditional though it may have been. Nor did the appeal on December 8, 1998, deprive the district court of jurisdiction to consider a motion for new trial filed within seven days. If such a motion had been filed, the district court either could have denied it or, if it was inclined to conditionally grant the motion, could have so certified to the appellate court which could have remanded the case. See United States v. Cronic, 466 U.S. 648, 667 n.42 (1984). If the district court had granted timely motion(s), the Government could have appealed that order and

---

[6] "An order of remand by an appellate court cannot enlarge the authority of a district court beyond the rules of criminal procedure." DiBernardo, 880 F.2d at 1225 (citing United States v. Smith, 331 U.S. at 471).

22

both orders of the district court could have been reviewed.  To allow a delay in filing a motion for new trial would raise the concern expressed in Smith that "such a practice would authorize the appellate process to be exercised in an advisory capacity while the trial court, regardless of the appellate opinion could set aside all that was the basis of appeal."  Id. at 473.

Strict compliance with the seven-day limit of Rule 33 will not leave defendants without any remedy.  Smith also addresses this concern:

> . . . New trials, however, may be granted for error occurring at the trial or for reasons which were not part of the court's knowledge at the time of judgment.  For the latter, the Rules make adequate provision.  Newly discovered evidence may be made ground for motion for new trial within two [now three] years after judgment.  Rule 33.  For the former, habeas corpus provides a remedy for jurisdictional and constitutional errors at the trial without limit of time. . . .  Possibility of unredressed injustice therefore remains only in prejudicial happenings during trial.  The trial judge is given power by the Rules to entertain motions for new trial within five [now seven] days after verdict and may extend that time for so long as he thinks necessary for proper consideration of the course of the trial.  But extension of that time indefinitely is no insurance of justice.  On the contrary, as time passes, the peculiar ability which the trial judge has to pass on the fairness of the trial is dissipated as the incidents and nuances of the trial leave his mind to give way to immediate business.  It is in the interest of justice that a decision on the propriety of a trial can be reached as soon after it has ended as is possible, and that decision be not deferred until the trial's story has taken on the uncertainty and dimness of things long past.

Id. at 475-76.  (internal citations omitted).

23

We conclude that the district court's determination that it did not have jurisdiction to decide the subject motions for new trial was correct.

SENTENCING ISSUES

This court reviews the district court's sentencing hearing findings of fact for clear error and its application of the sentencing guidelines to those facts de novo. United States v. Humber, 255 F.3d 1308, 1311 (11th Cir. 2001). These standards of review apply to both minimal planning determinations and loss determinations. See United States v. Daniels, 148 F.3d 1260, 1261 (11th Cir. 1998).

More Than Minimal Planning

While emphasizing that he still maintained that the defendants were not guilty of anything, and at one point, that he was "thoroughly and 100 percent convinced that a great injustice has been done and continues to be done . . . ," the district judge concluded that "if the defendants are guilty of these offenses, they involve more than minimal planning. . . . More than minimal planning is deemed present involving repeated acts, unless it is clear that each instance was purely opportune. And I can't say that it was purely opportune, assuming that there is guilt here." This finding was not clearly erroneous and is consistent with the holdings of this court in Daniels and Humber.

The offenses occurred over a two year period at two facilities and involved

the treatment of numerous patients covered by CHAMPUS and Medicare. Unquestionably, it involved repeated acts over a period of time, none of which was merely opportune. Therefore, the court correctly included the adjustment for more than minimal planning provided in U.S.S.G. § 2F1.1(b)(2)(A).

## Loss Calculation

The district court held that the facts of this case took it outside the heartland of other money laundering cases, and that it was more realistically a fraud case. The court thus applied the guideline at § 2F.1 rather than the money laundering guideline at § 2S1.1. This decision has not been appealed by either party.[7]

The defendants contended that "there is no loss to the government in this case, that no fee has been charged for any service which has not been performed." The Government's only purported proof of loss came in the form of two exhibits, 171 and 172, and testimony related thereto. Exhibit 171 purported to represent $2,830,515.70 paid by CHAMPUS, based on the Ft. Walton operation, and Exhibit 172 purported to represent $30,871.28 paid by Medicare, based on the Panama City operation.

The following pertinent colloquy followed the statement of the parties'

---

[7] In a "Report to Congress" dated September 18, 1997, and in proposed "Amendments to the Sentencing Guidelines" submitted to Congress on May 10, 2001, the Sentencing Commission has recognized the same problems with regard to sentencing for money laundering offenses as did the district judge here.

25

contentions.

> The Court: Well, the difficulty you are gonna have in establishing this, it seems to me, is that there is no way to determine how much of these charges for any of these patients is attributable to Dr. Renick. And I – I realize I'm not required to determine this amount with precision, but there has got to be some reasonable basis of determining out of all of the charge, $515 a day, for patients that may have seen Dr. Renick occasionally and perhaps not at all while they were in the hospital. We don't even know that he saw them.

> Ms. Heldmyer: Well, we do know that he was listed as attending physician on all of these patients. It's our contention, and I believe we had testimony to this effect, that had the – had CHAMPUS known that Dr. Renick was treating these patients they would have rejected the claim in toto, which means that the entire amount would be the amount of the loss.

> The Court: Well, I seem to recall that, but I also recall that it was a great deal of confusion about what was and what was not an acceptable way of billing this. But, nevertheless, with respect to the amount involved, regardless of what we are gonna do with it, what we are gonna have to focus on, as far as I'm concerned, is that the loss has to be viewed in context of what Dr. Renick did that was somehow directly billed to the government. There were other physicians working there. Certainly, their services were entirely appropriate. There were other physicians attending to Dr. Renick's patients. Undoubtedly, Dr. Renick attended some of the other physicians' patients. So I'm not sure that this exhibit has any – any particular significance as far as evidentiary purposes.

> . . . .

> The Court: Well, I do know that by contract he is only there two days a week.

> . . . .

26

The Court: So two days out of seven days means there is five days a week that they are billing for that he couldn't possibly have been involved.

. . . .

The Court: Well, I understand that's – the biggest part of this per diem charge is gonna be room and board. That's the hospital's part of this. How do we – how do we determine, Ms. Heldmyer, what is attributable to Dr. Renick?

Ms. Heldmyer: I don't know, Your Honor. I mean, I just – for the record, I would object to breaking that out, but I certainly – I suppose I could – I could check the records to see whether or not there is, at least internally, there is some sort of a breakdown in how much money is attributable to each of the services that was provided to these patients. But, frankly, because it was a flat per diem rate, I – I don't know that I'm gonna find any kind of a breakdown. (emphasis added).

The Court: Well, I don't think you can either.

. . . .

The Court: All right. Let's go to the other exhibit. This is Bay County. And there are only a limited number of patients here.

. . . .

The Court: Well, we can't look at gain to the defendants, because there is no evidence that the defendants got any gain at all out of this.

. . . .

Ms. Heldmyer: Other than their salary. They didn't earn a lot of money from this hospital in participating in the treatment of patients.

27

The Court: Well, I mean, there is no evidence that they didn't earn their salaries, otherwise, totally unrelated to the matters we are talking about.

. . . .

The Court: Well, I accept the fact that there is no actual loss, and trying to determine a measurable loss is – is getting extremely difficult, if not impossible. These – these exhibits are of no help at all. I'm looking at Exhibits 171 and 172. I certainly cannot utilize those.

. . . .

The Court: What's the government's recommendation if you cannot use these numbers, Ms. Heldmyer? What else do you have to fall back on?

Ms. Heldmyer: Your Honor, the only thing that I can tell the court is that I can try to inquire and try to get a breakdown on the CHAMPUS side, or actually on the Medicare side, too, to determine how much of that payment could be fairly allocated to psychiatrist – psychiatrist services. Perhaps there is some source of information that I can – I can reach out for to determine that. Otherwise, I will have to think about it, because, frankly I am not coming up with anything at this point, other than that. (emphasis added).

The Court: Well, it – it is a dilemma, and I am wrestling with that, too.

. . . .

The Court: . . . . There is no actual loss to the government and the patients all received what they bargained for and what they were entitled to receive. But assuming the defendants are guilty as they've been charged in this case, that means that Dr. Renick's services could not have been billed directly or indirectly. So whatever is attributable to Dr. Renick's services is what we are really trying to isolate out of this.

28

. . . .

The Court: [T]he underlying offense, essentially, says this is – this is what you do unless there is – unless there is an identifiable actual loss. The guideline itself says in the commentary the court need only make a reasonable estimate of the loss given the available information.

Ms. Heldmyer: Your Honor, there is no information on record before this court that – that these patients did receive adequate medical care. I mean, we all seem to be assuming that, Your Honor, but there is nothing on the record that they didn't receive adequate medical care.

The Court: Any number of the witnesses, including the doctors, I think, and some of the others were asked, did anybody not receive proper medical care, and they uniformly agreed that there was never a problem with that.

. . . .

The Court: Well, I have to agree that if the defendants are guilty as – as charged, as they have been found by the jury, then there has to be some – some kind of a loss attributable to this. And I can – even though I can't measure it, I can say that it would be attributable to whatever the government paid for Dr. Renick's services that it should not have. And in the absence of anything more concrete, I'm just gonna arbitrarily pick a number and say it's between 70,000 and a hundred twenty thousand and we will proceed.

. . . .

The Court: Ms. Heldmyer, do you have anything else you want to say on this?

Ms. Heldmyer: No, Your Honor.

The Court: All right. Let's – let's use that as a reasonable

29

estimate of the loss, 70 to 120 is a plus six for a specific offense characteristic.

Other pertinent statements made during the extended sentencing hearing include the following:

> The Court:  –repeated witnesses said that they were instructed that Dr. Renick was not to admit CHAMPUS or Medicare patients. He could admit all other patients, private insurance payment, but he could not admit those, and he could treat all patients.
>
> . . . .
>
> The Court:  Well, once again we've run into the semantics issue in this case, but there was no billing made for Dr. Renick's services. You don't dispute that there was no bill submitted to CHAMPUS that said for Dr. Renick's services?
>
> Ms. Heldmyer:  That's correct.
>
> The Court:  Or for a psychiatrist's services?
>
> Ms. Heldmyer:  Correct.
>
> The Court:  All right.
>
> . . . .
>
> Ms. Heldmyer:  I don't think it could – I could be wrong, but I don't think it could refer to Fort Walton Beach because they didn't itemize billing.  They didn't do any itemized billing in Fort Walton Beach.
>
> . . . .
>
> The Court:  Well, they key point is that CHAMPUS was not billed for treatment.  It was billed for a lock and key per diem charge.

So that's, again, what much of this case is about.

. . . .

The Court: Yeah. But, again, it's undisputed that he could treat CHAMPUS patients; he simply couldn't bill for them. And the question is whether the indirect billing on the per diem basis somehow violates something.

In essence the factual issues related to the determination of losses fall into two categories. First, the Government claimed a $2,830,515.70 "loss" based on the total per diem charges billed to CHAMPUS for services provided at the Ft. Walton, Florida facility. At the sentencing hearing, the Government apparently claimed that all of the CHAMPUS billings were for Renick's patients. Counsel for the Government stated:

> [I]t's the United States' position that the loss figures are reflective of the amount of money that was paid to the facilities as a result of . . . improper services that should not have been rendered and should not have been billed . . . by these facilities. Therefore, all of the amount of money that was paid by CHAMPUS and Medicare for Dr. Renick's services is – is includable in the loss figures. . . . Helen D'Arcy . . . submitted these documents which indicate [Exhibit] 171 is the loss in Fort Walton Beach for . . . federal payments based upon Dr. Renick's patients, which amounted to $2,746,465.

These statements are obviously not supported by the evidence. The district court stated, "Well, this CHAMPUS figure, I don't know where this comes from, $2,839,967, but I know for a fact that that cannot be for Dr. Renick's services."

Second, the Government claimed a "loss" of $30,871.28 for charges to Medicare

31

for services provided at the Panama City, Florida facility.  As to the CHAMPUS charges, the Government's attorney acknowledged that there was no way to determine what part of the per diem rate "is attributable to Dr. Renick."  As indicated above, she stated, "I don't know, Your Honor. . . .  But, frankly, because it was a flat per diem rate, I – I don't know that I'm gonna find any kind of a breakdown."  The district judge stated that he could not make appropriate findings based simply on Exhibit 171 and testimony related thereto.

As to the Medicare claim, while Exhibit 172 indicated billings to Medicare for services of Renick, the district judge felt that those billings may have resulted from negligence or by mistake of persons other than the defendants who knew that Renick's services were not to be billed to Medicare.  Although the purported evidence provided by Exhibit 172 was more specific as to the charges for services of Renick than was the purported evidence provided by Exhibit 171, the district judge stated that, "I certainly cannot utilize those [171 and 172]."  In effect, the district court rejected the evidence offered by the Government as to loss.  While stating that he would make a "reasonable estimate" of loss of $70,000-120,000, he further acknowledged that "I'm just gonna arbitrarily pick a number between $70,000 and $120,000 . . . ."

We review the district court's loss determination for clear error.  United

32

States v. Goldberg, 60 F.3d 1536, 1539 (11th Cir. 1995). The guidelines do not require the government to make a fraud loss determination with precision; the figure need only be a reasonable estimate given the information available to the government. United States v. Dominguez, 109 F.3d 675, 676 (11th Cir. 1997). Upon challenge, however, the government bears the burden of supporting its loss calculation with "reliable and specific evidence" United States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997); United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995); United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).

In Cabrera, this court held that the government had not presented sufficient evidence to support the amount of loss attributed to the defendant and vacated the sentence and remanded for re-sentencing. Id. at 1294. The court rejected the government's argument that the fraud loss should be based on all unauthorized "cloned" phone calls without proof that specifically attributed each cellular provider's loss to the defendant. Id. at 1293-94. The court stated, "We hold that telephone cloning fraud loss is attributable to a defendant, and therefore can be utilized to enhance the defendant's sentence, only if the government provides reliable proof linking the defendant to the ESN/MIN combinations fraudulently used." Id. The court further held that proof of mere possession of the equipment which caused the loss was not sufficient to attribute the loss to the defendant. Id. at

1294.  The court also held that, "A sentencing judge must make factual findings sufficient to support the government's claim of the amount of the fraud loss attributed to a defendant in a PSI."  Id.  The court cited United States v. Bernardine, 73 F.3d 1078, 1081 (11th Cir. 1996), which suggests that the district court cannot simply rely upon conclusory factual recitals of the PSI.  Cabrera, 172 F.3d at 1294.  This court has also stated, "although 'the district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines, its reasonable estimate of the intended loss will be upheld on appeal.'"  Dominquez, 109 F.3d at 676 (internal citation omitted).

We reject the Government's argument that the district court should have attributed the total amount of the CHAMPUS billings to Renick's participation and found that that total amount was a "loss."  The only case cited by the Government in support of its argument is United States v. Miller, 188 F.3d 1312, 1316-17 (11th Cir. 1999), which it cites for the proposition that the loss need not be determined with precision and that "the court need only make a reasonable estimate of the loss, given the available information."  The court in Miller had specific evidence from which it could make a reasonable estimate.  The district court here would have had to merely speculate on the amount of any CHAMPUS billings, if any, attributable to Renick.  It cannot do so.  United States v. Wilson, 993 F.2d 214, 218 (11th Cir.

34

1993).

The Government has not cited <u>any</u> cases for the proposition that the total CHAMPUS billings can be considered as "loss." Cases from other circuits suggest to the contrary. <u>See</u> <u>United States v. Schneider</u>, 930 F.2d 555 (7th Cir. 1991) (providing that loss can not be calculated based on entire price of fraudulently obtained contract if defendant has means to and is able to perform); <u>United States v. Sublett</u>, 124 F.3d 693 (5th Cir. 1997) (following <u>Schneider</u> holding in fraudulent procurement of government contract case); <u>United States v. Rutgard</u>, 116 F.3d 1270 (9th Cir. 1997) (finding error for district court to base Medicare fraud loss on total proceeds of medical practice because the practice was "permeated with fraud"); <u>United States v. Maurello</u>, 76 F.3d 1304 (3rd Cir. 1996) (finding that fees paid for satisfactory services to disbarred lawyer not considered as loss; argument that no client would have paid any money to known disbarred lawyer rejected; complaints of dissatisfied clients alone do not provide basis for reasonable estimate; government must prove the complaints are bona fide); <u>United States v. Barnes</u>, 125 F.3d 1287 (9th Cir. 1997) (holding that district court erred in using total amount of billings attributable to person impersonating a doctor when, absent his salary, there was no monetary loss to clinic, donors or customers; must give credit for amount of satisfactory services).

In <u>Wilson</u>, this court held that the district court erred in calculating fraud "loss" based on the entire face amount of fraudulently induced loans. 993 F.2d at 218. In <u>United States v. Orton</u>, 73 F.3d 331, 334 (11th Cir. 1996), this court stated:

> The individuals who receive a "return" or break even on their "investments" are not victims for purposes of § 2F1.1. At most, they are unwilling pawns in the Ponzi scheme. These individuals may be exposed to a risk of harm by the Ponzi scheme, but the risk of harm should not be considered in estimating the loss under § 2F1.1. Under § 2F1.1 "the risk created enters into the determination of the offense level only insofar as it is incorporated into the base offense level. Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred." U.S.S.G. § 1B1.3, comment. (n.5).

Application note 8(b) to the Commentary to § 2F1.1 of the Sentencing Guidelines states:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

We conclude that the finding of the district court that there was no actual loss to any entity was not clearly erroneous. There was no finding of an intended loss nor any evidence to support such a finding. Exhibit 171 and related testimony established neither actual loss nor intended loss, particularly as it related to any

36

purported charges by or payments to Renick. Some confusion arose because of some staff members' belief that Renick could not even treat patients, whether or not his services were billed to CHAMPUS or Medicare. There is no evidence that he could not legally treat patients. The panel in the first appeal in this case stated that "It is, however, undisputed that the exclusion forbade Renick from billing but did not preclude his treatment of Medicare patients." Later, the panel stated that "It is undisputed that Renick did not bill Medicare or CHAMPUS directly for his services." It is likely that any alleged victim of a fraud would assert that it would not have paid anything had it known of the "fraud." Such an assertion is not, however, the measure of a "loss." That CHAMPUS may have "rejected the claim in toto" if it had known that Renick treated some patients would not be determinative, in and of itself, of the "loss" to be calculated under the sentencing guidelines. Alleged victims cannot determine their own "losses." The Government had the burden to prove the amount of the loss by a preponderance of the evidence. United States v. Dabbs, 134 F.3d 1071, 1081 (11th Cir. 1998). It did not do so, certainly not with "reliable and specific evidence." The district court's "arbitrary" assignment of the difference between $30,871.28 and at least $70,000.00 to the CHAMPUS billings was an abuse of discretion and contrary to law. After the district court correctly determined that the Government had not met

37

its burden of proof through Exhibit 171 and related testimony, there was no basis for making a reasonable estimate as to a CHAMPUS "loss." It is apparent that the district court felt some duty to find some loss, arbitrary or otherwise, but the district court stated no findings upon which its "estimate" was made.

One possible basis for the district court's CHAMPUS "estimate" is stated in said Application Note 8(b) which states: "Where the loss determined above significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted." See also U.S.S.G § 5K2.7. See Wilson, 993 F.2d at 218. There is no indication, however, that the district court was applying any such provision. We conclude that the district court's loss determination in excess of $30,871.28 must be reversed. Although there is some suggestion that the district court believed that the Medicare billing at the Panama City facility in the amount of $30,871.28 related to Renick's services was billed negligently or by mistake, it did at least afford a reasonable basis for at least a portion of the district court's loss finding. We affirm a loss finding in the amount of $30,871.28.

## SUMMARY

We conclude that there is no merit to any of the appellants' arguments except as to their argument that the court erred in determining the loss for

sentencing purposes. We reject the Government's argument that the loss amount used by the district court was too low. We vacate the sentence and remand the case to the district court for re-sentencing consistent with this opinion on the limited basis that the loss amount to be applied is $30,871.28. On remand, the district court can also consider, however, departing upward if the court concludes that the loss as calculated is not representative of the severity of the offenses and/or the disruption of governmental programs. We make no suggestions one way or the other as to the appropriateness of any such departure. See United States v. Regueiro, 240 F.3d 1321, 1324 (11th Cir. 2001).

JUDGMENTS OF CONVICTIONS AFFIRMED.

SENTENCINGS VACATED AND REMANDED FOR RESENTENCINGS.