[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-10697
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 10, 2012
JOHN LEY
CLERK

D.C. Docket No. 4:10-cr-00050-RH-WCS-2


UNITED STATES OF AMERICA,

                                                              Plaintiff-Appellee,

                              versus

ROBERT NIXON,

                                                              Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(April 10, 2012)


Before TJOFLAT, EDMONDSON and ANDERSON, Circuit Judges.

PER CURIAM:

Robert Nixon appeals his convictions and sentences for conspiracy to steal or misapply funds from an organization that receives federal assistance and to commit wire fraud, in violation of 18 U.S.C. §§ 371, 1349, 666(a)(1)(A), and 1343; stealing or misapplying funds from an organization that receives federal assistance, and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2; and misapplying funds as a credit union employee, and aiding and abetting, in violation of 18 U.S.C. §§ 657 and 2. On appeal, Nixon argues that the evidence at trial was insufficient to convict him of the crimes charged. Nixon also argues that the district court clearly erred at sentencing in calculating a reasonable loss amount under U.S.S.G. § 2B1.1(b)(1).[1]

## I.      The Sufficiency of the Evidence

Nixon argues that the district court erred in denying his motion for judgment

---

[1] Nixon attempts to adopt by reference, without further specification, all portions of the brief of his codefendant Eugene Telfair, filed in appeal number 11-10627. Telfair raises an additional issue regarding the two-level enhancement he received at sentencing pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust. Nixon's attempt to adopt by reference Telfair's sentencing enhancement argument fails because the blanket statement is not sufficiently detailed to comply with our rules regarding adopting another party's brief. *See* 11th Cir. R. 28-1(f) (requiring "a statement in detail" of the portions of the brief that are adopted). The adoption also fails because "the determination of whether a defendant occupied a position of trust is extremely fact sensitive." *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010) (quotation omitted).

Nixon also mentions that the sentencing court erred in concluding that he obstructed justice through his testimony, but he fails to make any argument or provide any citation to authority as to the issue. Accordingly, Nixon has abandoned this issue. *Rowe v. Schreiber*, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (refusing to reach an issue mentioned in passing in the brief filed by counsel because the issue had no supporting argument or discussion).

of acquittal, and that the evidence at trial was insufficient to convict him of any of the crimes charged, because the evidence showed that his alleged co-conspirator, Eugene Telfair, had a contract for consulting services with Florida Agricultural and Mechanical University ("FAMU"). Nixon asserts generally that, pursuant to the terms of the consulting services agreement ("CSA") Telfair had with FAMU, Telfair was entitled to $150,000.00 that was at issue in the case. So, Nixon argues, as a matter of law, he and Telfair cannot be convicted of stealing or conspiring to steal money that is lawfully Telfair's, which Telfair shared with Nixon. Nixon asserts that, although FAMU remitted the $150,000.00 check at issue to FAMU Federal Credit Union ("FAMU FCU"), the check was intended for Telfair pursuant to the CSA, and Telfair had the authority as President of FAMU FCU to negotiate the check.

We review *de novo* the denial of a motion for judgment of acquittal, and in reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence "in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." *United States v. DuBose*, 598 F.3d 726, 729 (11th Cir. 2010) (quotation omitted). The standard of review for sufficiency of the evidence is whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v.*

3

*Godinez*, 922 F.2d 752, 755 (11th Cir. 1991). "The question is whether reasonable minds *could* have found guilt beyond a reasonable doubt, not whether reasonable minds *must* have found guilt beyond a reasonable doubt." *United States v. Bacon*, 598 F.3d 772, 775 (11th Cir. 2010) (quotation and alteration omitted). Accordingly,

> It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.

*United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (quotations omitted).

We are "bound by the jury's credibility choices, and by its rejection of the inferences raised by the defendant." *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005). Additionally, "when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication." *United States v. Vazquez*, 53 F.3d 1216, 1225 (11th Cir. 1995). Furthermore, we have held that if the jury does not believe the defendant's version of events, the statements made by the defendant may be considered by the jury as

substantive evidence of the defendant's guilt, at least where some corroborative evidence exists for the charged offense. *United States v. Brown*, 53 F.3d 312, 314-15 (11th Cir. 1995). "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge . . . ." *Id.*

In order to convict someone of engaging in a conspiracy, the government must prove: "1) the existence of an agreement to achieve an unlawful objective, 2) [the defendant's] knowing and voluntary participation in the agreement, and 3) the commission of an act in furtherance of the agreement." *United States v. Tampas*, 493 F.3d 1291, 1298 (11th Cir. 2007); 18 U.S.C. § 371. "The knowledge requirement is satisfied when the [g]overnment shows a defendant's awareness of the essential nature of the conspiracy." *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006). The agreement and participation in the conspiracy need not be explicit and may be inferred from circumstantial evidence. *United States v. Prince*, 883 F.2d 953, 957 (11th Cir. 1989). "[T]he defendant's assent can be inferred from acts that furthered the conspiracy's purpose." *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir. 1982) (quotation omitted).

In order to convict someone of stealing or misapplying funds from an organization receiving federal assistance, the government must prove: 1) the

defendant converted property owned by, or under the care, custody, or control of an organization receiving federal assistance; 2) the defendant was an agent of such an organization; 3) that property was valued at $5,000 or more; and 4) the organization received in excess of $10,000 in federal funds during the 1-year period in which the defendant converted the property. 18 U.S.C. § 666(a)(1)(A); *Tampas*, 493 F.3d at 1298. The statute defines an "agent" as one who is "authorized to act on behalf of another" and, "in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1); *United States v. Langston*, 590 F.3d 1226, 1233-34 (11th Cir. 2009).

"The elements of wire fraud under 18 U.S.C. § 1343 are (1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence." *Id.* at 1270-71 (citations omitted). An interstate wire transmission is "for the purpose of executing" the scheme to defraud if it is "incident to an essential part of the scheme" or "a step in the plot." *Id.* at 1272-73 (quotations omitted).

6

In order to convict someone of misapplying funds as a credit union employee, the government must prove: 1) the defendant was an employee of the credit union, 2) he willfully misapplied funds intrusted to the credit union's care, 3) he acted with intent to injure or defraud the credit union, and 4) the credit union's accounts were insured by the National Credit Union Administration Board. 18 U.S.C. § 657; *see United States v. Payne*, 750 F.2d 844, 855 (11th Cir. 1985) (setting forth the elements of misapplying bank funds under 18 U.S.C. § 657).

Pursuant to 18 U.S.C. § 2:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

*United States v. Corley*, 824 F.2d 931, 933 (11th Cir. 1987). To prove a defendant is guilty of aiding and abetting the commission of a crime in violation of 18 U.S.C. § 2, the government must prove the defendant assisted the perpetrator of the crime and shared the requisite criminal intent. *United States v. Schwartz*, 666 F.2d 461, 463 (11th Cir. 1982). The government must prove "the defendant associated himself with a criminal venture, participated in it as something he wished to bring

7

about and sought by his actions to make it succeed." *Id.* (quotation omitted).

The evidence was sufficient for a reasonable jury to conclude that Nixon and Telfair, who was the President of FAMU FCU, knowingly and willfully conspired to steal and actually stole at least $134,000.00 in grant funds belonging to FAMU, which FAMU had entrusted to the care of FAMU FCU. Nixon asserts that his appeal turns on the fact that Telfair was lawfully entitled to the $150,000.00 at issue, pursuant to the July 15, 2004, CSA, and thus, he cannot be convicted of stealing or conspiring money that lawfully belonged to Telfair. However, taking the evidence in the light most favorable to the government, the evidence at trial supported a finding that the $150,000.00 belonged to FAMU rather than Telfair.

The evidence showed that the grant documents provided for consulting services with FAMU FCU, not with any individual consultant, and that HUD approved FAMU FCU as the vendor and the custodian of the MLP under the grant agreement. FAMU's purchasing director and general counsel approved and officially executed the CSA, which provided for the $150,000.00 payment at issue, based upon their belief that the agreement was with FAMU FCU, not Telfair. Although the CSA listed Telfair as the payee, there was testimony that, because Telfair was the President of FAMU FCU, he would have been the person to sign

8

the contract on behalf of FAMU FCU. After checking the grant documents for compliance, Toletha Sylvester Harris approved a requisition order for a payment of the $150,000.00 to FAMU FCU. Dr. Gray-Ray, who had approved and signed the CSA, completed a purchase exemption for "Contractual services with FAMU Federal Credit Union." Thereafter, FAMU issued a check made payable to FAMU FCU, not Telfair, for $150,000.00, which Telfair endorsed on behalf of FAMU FCU and deposited into the "CCEDI-FAMU Urban Policy Grant" account. The evidence showed that the account had been used as a depository for grant funds, including funds used to secure micro-loans under the MLP. There was no evidence of any other account which also held FAMU's grant funds.

The evidence further showed that after Telfair deposited the $150,000.00 check into the grant account, he withdrew $15,000.00, or 10% of the deposit, as his fee for administering the MLP, and deposited it into his personal bank account. The ten percent fee was provided for in the CSA, as well as the agreement under which FAMU FCU had administered the MLP under the prior HUD grant. The evidence showed that Telfair always withdrew an amount equivalent to roughly ten percent of each of the grant deposits, which was consistent with the administrative fee the parties had agreed to. Telfair did not claim the $150,000.00 on his income tax return in 2004, 2005, 2006, 2007, or 2008. Based on this

9

evidence, it was reasonable for the jury to conclude that the $150,000.00 at issue belonged to FAMU and not Telfair.

The evidence was also sufficient for a reasonable jury to find that Nixon and Telfair conspired to steal and actually stole approximately $134,000.00 in grant funds belonging to FAMU. Although, as discussed above, the evidence supported that the $150,000.00 in the CCEDI-FAMU account at issue did not belong to Telfair, the evidence also showed that, from 2004 to 2008, Telfair caused the TIN on the CCEDI-FAMU grant account to be changed multiple times, with the final TIN being his own SSN. He also altered the signature cards for the account, eventually listing himself and Nixon as the authorized signors, which gave them the ability to write checks to one another until they depleted the account's funds. Even though Telfair and Nixon, as signors on an account bearing their SSNs, had gained access to the funds in the CCEDI-FAMU account, the evidence showed that they drafted multiple false contracts in an attempt to facilitate and conceal their theft of the remaining grant funds in the CCEDI-FAMU account.

On June 24, 2008, Telfair signed an agreement with Nixon, who signed on behalf of the Institute, which purported to entitle Telfair to seven percent of the funds remaining in the CCEDI-FAMU account. Pursuant to his agreement with the "Institute," Telfair was to continue administering the MLP, and he was to

10

provide several listed documents related to the MLP. However, the evidence showed that (1) the grant was closed on November 28, 2006, and there were no new grant funds; (2) the last loan check under the Institute's MLP was distributed on August 21, 2007; and (3) Telfair had already provided the same MLP documents under two previous contracts. The evidence showed that Telfair then e-mailed Nixon another copy of the June 24, 2008, contract, reflecting a change in the contract's payment terms from seven, to five percent, of the account balance. The e-mail also contained a post-dated invoice in which Telfair purported to bill the Institute for his administration of the MLP through June 30, 2008. Thereafter, on June 28, 2008, Nixon wrote Telfair a check representing five percent of the CCEDI-FAMU account balance, pursuant to the invoice under the new contract. Ultimately, Nixon wrote Telfair two checks from the "CCEDI-FAMU Urban Policy Grant" account, which together totaled an amount exactly equal to seven percent of the balance of the grant account

Regarding this specific contract, Nixon testified that he knew the contract was not real, and that it was a just a "feel good document" for Telfair, "in the event that he [was] ever questioned about [work that he had actually done before]." Yet, Nixon wrote the check to Telfair for five percent of the CCEDI-FAMU account balance, pursuant to the admittedly fraudulent "contract" with "the

11

Institute," after Telfair e-mailed him an invoice for work that Telfair had yet to complete. Also, Coates testified that Nixon wrote Telfair checks from the CCEDI-FAMU account around the same time that Nixon bought a new car. Nixon had also been delinquent in paying his monthly car loan payments to FAMU FCU, but Telfair gave Nixon an extension on the payments. Finally, as here, where the defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication. *Vazquez*, 53 F.3d at 1225. Additionally, because the jury did not believe Nixon's version of events, as was evidenced by the guilty verdict in this case, Nixon's statements could have been considered by the jury as substantive evidence of his guilt. *Brown*, 53 F.3d at 315. This Court has held that "[t]his rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge . . . ." *Id.* Accordingly, this evidence was sufficient for a jury to conclude that Nixon knew that Telfair was using the admittedly fraudulent contract to legitimize his taking of funds that belonged to the Institute of FAMU, and Nixon aided and abetted the crime by writing the check for the funds despite his knowledge of the fraud.

The evidence further supported that Telfair and Nixon created two more

12

fraudulent contracts in an attempt to facilitate and conceal their theft of funds they knew belonged to FAMU.  The evidence showed that, at some point, Telfair and Nixon signed the "addendum" referring to Telfair and Nixon as "plan administrators" and providing that they were "responsible for the day-to-day administration of the Micro-Loan Program as independent contractors," for which they were "eligible to collect administrative fees from the balance remaining." Also, in November 2008, Telfair and Nixon signed a "personal services contract," under which Nixon was to work in conjunction with Telfair to monitor the existing MLP and develop new programs.  Payment for these services was to come from "administration and/or pool funds remaining after the liquidation of any loan offsets, charge-offs."   Approximately 1 month later, Telfair and Nixon wrote checks to one another for $60,067.55, which they each deposited into their personal bank accounts.  These checks, along with the checks that Nixon had previously written Telfair pursuant to the admittedly fraudulent contract, indicated on the face of the checks that they were from the "CCEDI FAMU Urban Policy Grant" account.

The evidence supported that these contracts involved (1) duplication of products and services, which were largely unnecessary, or had already been completed or authorized under previous contracts; (2) payment of an amount that

was inconsistent with the value of the services provided; and (3) vague obligation and payment terms. Accordingly, taking the evidence in the light most favorable to the government, the evidence was sufficient for a reasonable jury to conclude that Nixon and Telfair conspired to steal and actually stole at least $134,000.00 in grant funds belonging to FAMU. Moreover, as discussed above, if the money remaining in the CCEDI-FAMU account already belonged to Telfair under the CSA, as Nixon argues on appeal, Nixon and Telfair would not have had to draft these "contracts" in an attempt to establish their right to the funds. Finally, as discussed above, Nixon's statements regarding his knowledge and intent could have been considered by the jury as substantive evidence of his guilt. *Brown*, 53 F.3d at 315.

As to Nixon's argument that the government failed to prove certain elements of each of the crimes charged, as discussed below, the record indicates that there was sufficient evidence as to each of those essential elements such that a reasonable jury could find that Nixon was guilty beyond a reasonable doubt.

As to the conviction for conspiracy to steal funds from FAMU, Nixon's argument that he could not conspire to steal funds that lawfully belonged to Telfair fails because, as discussed above, the evidence was sufficient for a reasonable jury to conclude that the funds at issue did not belong to Telfair. Moreover, as

14

previously discussed, there was sufficient evidence that Nixon and Telfair conspired to create contracts purporting to establish their entitlement to funds that they knew did not belong to them, and that they wrote checks to one another in order to obtain those funds.

As to Nixon's argument that the evidence was insufficient to prove that he and Telfair conspired to commit wire fraud, the evidence showed that Telfair sent two e-mails to Nixon in order to facilitate the fraudulent scheme to steal FAMU's funds. As discussed above, the first e-mail transmitted the fraudulent June 24, 2008, contract and the invoice billing the Institute for Telfair's services, through which Telfair and Nixon attempted to legitimize their theft of FAMU's grant funds. Additionally, in the second e-mail, Telfair asked Nixon for the FAMU Small Business Development Center's TIN, with which Telfair also sought to legitimize his fraudulent activity. The evidence showed that the TIN for the CCEDI-FAMU account was changed FAMU on June 21, 2005. Accordingly, these e-mails were sufficient evidence on which a reasonable jury could conclude that Nixon and Telfair conspired to commit wire fraud.

As to Nixon's conviction for stealing funds belonging to FAMU, the evidence was sufficient for a reasonable jury to conclude that the funds belonged to FAMU. Contrary to Nixon's assertions, as previously discussed, the evidence

15

was sufficient to establish that the $150,000.00 belonged to FAMU, as opposed to any other entity, including Telfair. Taking the evidence in the light most favorable to the government, HUD originally awarded the grant money to FAMU. Pursuant to the grant agreement, FAMU contracted with FAMU FCU to establish the MLP. Then, FAMU entrusted FAMU FCU with the funds in order to secure loans FAMU FCU provided under the MLP. The $150,000.00 check at issue was drawn from FAMU's account, and it was deposited into FAMU's grant account at FAMU FCU. There was no evidence that the $150,000.00 was used to cover defaulted micro-loans such that FAMU FCU was entitled to the money, and as previously discussed, sufficient evidence supported that Nixon and Telfair in fact stole the funds in question. Accordingly, the evidence was sufficient for a reasonable jury to find that the funds rightfully belonged to FAMU, which had entrusted the funds to the care of FAMU FCU before the funds were stolen.

As to Nixon's argument that the government failed to prove that Telfair was acting as an agent of FAMU, the argument fails because the evidence supported that (1) Telfair was authorized to act on behalf of FAMU in administering the MLP, including using FAMU's money to secure micro-loans which Telfair informed loan recipients were FAMU micro-loans; (2) Telfair held himself out as the administrator of the MLP for FAMU; (3) Telfair was authorized to sign and

16

did sign a contract on behalf of FAMU for the virtual incubator, wherein Telfair was listed as the micro-loan Administrator "representing, and for the benefit of, the INSTITUTE" at FAMU. Because 18 U.S.C. § 666(d)(1) specifically provides that a representative is an agent, the evidence was sufficient for a reasonable jury to find that Telfair acted as an agent of FAMU. Moreover, it is uncontested that Nixon, in his capacity as director of the Institute, who was tasked specifically with closing out the SNI grant, was acting as an agent of FAMU when he stole funds belonging to FAMU.

Regarding Nixon's conviction for aiding and abetting Telfair's stealing funds as a credit union employee, Nixon argues that the government failed to prove that he "knowingly and willfully" stole the funds entrusted to the care of FAMU FCU, because Telfair was contractually entitled to the $150,000.00. However, as discussed above, there was sufficient evidence on which a reasonable jury could rely to conclude that Telfair was not entitled to the $150,000.00 payment, and further, that Nixon and Telfair knowingly and willfully stole those funds. Taking the evidence in the light most favorable to the government, as discussed above, the evidence showed that the $150,000.00 FAMU entrusted to the care of FAMU FCU remained in the grant account, and because Telfair knew that he could not withdraw the funds belonging to FAMU FCU, he conspired with

17

Nixon to draft three contracts purporting to establish Nixon's and Telfair's right to the funds, and then they wrote checks to one another from the grant account. The evidence supports the conclusion that those contracts would have been unnecessary if the funds already belonged to Telfair, or even if he had a good faith belief that they did. Instead, Telfair presented to Hursey the "addendum" that he and Nixon had signed in order to try and convince her that the funds were his. Telfair even told Hursey that the grant account was his, after he had changed the account's TIN to his SSN, and caused the account's signature cards to be changed so that he and Nixon could write one another checks from the grant account. Accordingly, the evidence was sufficient to establish that Telfair knowingly and willfully stole money entrusted to FAMU FCU, and that Nixon aided and abetted him in so doing. As discussed above, Nixon "associated himself with [the] criminal venture, participated in it as something he wished to bring about and sought by his actions to make it succeed." *Schwartz*, 666 F.2d at 463.

Additionally, the evidence was sufficient to establish that Telfair intended to injure or defraud FAMU FCU, as the evidence showed that FAMU FCU approved of Telfair's administration of the MLP, and his receipt of fees, but not of his theft of over $134,000.00 in grant funds FAMU had entrusted to its care. Accordingly, the evidence was sufficient for a reasonable jury to conclude that

18

Telfair's knowing and willful theft of funds entitled to FAMU FCU's care was consistent with an intent to injure and defraud. Finally, as discussed above, the evidence was sufficient for a reasonable jury to conclude that Nixon aided and abetted Telfair in stealing funds as a credit union employee.

Because the evidence was sufficient for a reasonable jury to conclude that the $150,000.00 did not belong to Telfair, and that Nixon and Telfair conspired to steal and actually stole at least $134,000.00 from the grant account, this Court should affirm as to this issue.

II.    **The loss amount attributed to Nixon at sentencing under U.S.S.G. § 2B1.1(b)(1)**

Regarding the amount of loss attributed to him at sentencing, Nixon argues that the actual loss should have been $32,179.66, which represents the $150,000.00 in grant funds at issue, minus $51,149.62 for legitimate withdrawals, and $66,670.72 for funds Nixon and Telfair pledged towards restitution. Accordingly, because the loss amount should have been $32,179.66, there should only have been a 6-level increase to his base offense level under § 2B1.1(b)(1), instead of the 10-level increase the district court applied.

We review the district court's fraud loss calculation at sentencing for clear

error. *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001). Pursuant to U.S.S.G. § 2B1.1(b)(1), if the loss amount from a fraud was more than $120,000.00, but not more than $200,000.00, the offense level is increased by 10 levels. The district court must make a reasonable estimate of the loss amount, which is the greater of the actual loss or the intended loss. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1343 (11th Cir. 2009) (citing U.S.S.G. § 2B1.1, comment. (n.3(A))). The Guidelines define the "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(i)). In calculating the loss amount, the commentary to § 2B1.1 states that the loss shall be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). The district court's estimate of the loss need only be reasonable. *Renick*, 273 F.3d at 1025; U.S.S.G. § 2B1.1, comment. (n.3(C)). Because the sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence, the district court's loss determination is entitled to appropriate deference. *See* U.S.S.G. § 2B1.1, comment. (n.3(C)); *see also United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999).

Here, the district court did not clearly err when it determined that Nixon was responsible for an actual loss between $120,000.00 and $200,000.00, and thus, that the 10-level enhancement was appropriate. Based on the findings of the jury, which as previously discussed, were supported by sufficient evidence, as well as the PSI and the evidence presented at sentencing, the district court's determination of the loss attributable to Nixon appears to be a reasonable estimate of the loss, and thus, not clearly erroneous.

First, as discussed above, the evidence supports the district court's finding that Telfair and Nixon stole at least $134,000.00 in grant funds belonging to FAMU, as they knowingly deposited 4 checks from FAMU's grant account, totaling approximately $134,000.00, into their own personal bank accounts, even though they knew that they were not entitled to the money. Next, the evidence supports the finding of the district court that a total of at least $300,000.00 in grant funds was deposited into the account, all of which Nixon and Telfair could have stolen. As such, the district court properly rejected Telfair's assertion at sentencing that the baseline for calculating the loss amount was the $150,000.00 check Telfair argued that he was entitled to. Accordingly, the district court properly rejected Telfair's assertion at sentencing that the loss amount should have been reduced by the amount of legitimate withdrawals from the account, as

21

account funds other than those Nixon and Telfair stole were available to cover those legitimate withdrawals. Moreover, the district court correctly pointed out that the evidence showed that there were cancelled checks in the amount that Nixon and Telfair stole from the account, which was approximately $134,000.00, regardless of whether any other withdrawals were legitimate. Finally, the district court correctly rejected Telfair's assertion at sentencing that the loss amount should be reduced by the amount Nixon and Telfair pledged in restitution, as the Guidelines suggest that the loss amount shall only be reduced by the money returned *before* the offense was detected. U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). Accordingly, because there is no evidence that Nixon or Telfair returned any money before their offenses were detected, this Court should affirm as to this issue.

## Conclusion

The evidence was sufficient for a reasonable jury to find Nixon guilty on each of the charged offenses. Also, the district court did not clearly err in calculating a reasonable fraud loss amount in this case. Accordingly, we affirm Nixon's convictions and sentences.

**AFFIRMED.**