[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10627
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 10, 2012
JOHN LEY
CLERK

D.C. Docket No. 4:10-cr-00050-RH-WCS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EUGENE TELFAIR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 10, 2012)

Before TJOFLAT, EDMONDSON and ANDERSON, Circuit Judges.

PER CURIAM:

Eugene Telfair appeals his convictions and sentences for conspiracy to steal

or misapply funds from an organization that receives federal assistance and to

commit wire fraud, in violation of 18 U.S.C. §§ 371, 1349, 666(a)(1)(A), and

1343; stealing or misapplying funds from an organization that receives federal

assistance, and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and

2; and misapplying funds as a credit union employee, and aiding and abetting, in

violation of 18 U.S.C. §§ 657 and 2.  On appeal, Telfair argues that the evidence at

trial was insufficient to convict him of the crimes charged.  Telfair also argues that

the district court clearly erred at sentencing in calculating a reasonable loss

amount under U.S.S.G. § 2B1.1(b)(1), and that it erred in concluding that the two-

level enhancement for abuse of a position of trust was appropriate under U.S.S.G.

§ 3B1.3.[1]

I.     **The Sufficiency of the Evidence**

Telfair argues that the district court erred in denying his motion for

judgment of acquittal, and that the evidence at trial was insufficient to convict him

of any of the crimes charged, because the evidence showed that he had a contract

for consulting services with Florida Agricultural and Mechanical University

---

[1] Telfair attempts to adopt the arguments in the brief of his codefendant Robert Nixon, filed in appeal number 11-10697, but Nixon raises no additional issues.  Therefore, Telfair's attempt to adopt Nixon's brief has no practical impact on the appeal.

("FAMU"). Telfair asserts generally that, pursuant to the terms of the consulting services agreement ("CSA"), he was entitled to $150,000.00 that was at issue in the case, so as a matter of law, he cannot be convicted of stealing or conspiring to steal money that is lawfully his. Telfair asserts that although FAMU remitted the $150,000.00 check at issue to FAMU Federal Credit Union ("FAMU FCU"), the check was intended for him pursuant to the CSA, and he had the authority as President of FAMU FCU to negotiate the check.

We review *de novo* the denial of a motion for judgment of acquittal, and in reviewing the sufficiency of the evidence underlying a conviction, we consider the evidence "in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." *United States v. DuBose*, 598 F.3d 726, 729 (11th Cir. 2010) (quotation omitted). The standard of review for sufficiency of the evidence is whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Godinez*, 922 F.2d 752, 755 (11th Cir. 1991). "The question is whether reasonable minds *could* have found guilt beyond a reasonable doubt, not whether reasonable minds *must* have found guilt beyond a reasonable doubt." *United States v. Bacon*, 598 F.3d 772, 775 (11th Cir. 2010) (quotation and alteration omitted). Accordingly,

3

It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.

*United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (quotations omitted). We are "bound by the jury's credibility choices, and by its rejection of the inferences raised by the defendant." *United States v. Peters*, 403 F.3d 1263, 1268 (11th Cir. 2005).

In order to convict someone of engaging in a conspiracy, the government must prove: "1) the existence of an agreement to achieve an unlawful objective, 2) [the defendant's] knowing and voluntary participation in the agreement, and 3) the commission of an act in furtherance of the agreement." *United States v. Tampas*, 493 F.3d 1291, 1298 (11th Cir. 2007); 18 U.S.C. § 371. "The knowledge requirement is satisfied when the [g]overnment shows a defendant's awareness of the essential nature of the conspiracy." *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006). The agreement and participation in the conspiracy need not be explicit and may be inferred from circumstantial evidence. *United States v. Prince*, 883 F.2d 953, 957 (11th Cir. 1989). "[T]he defendant's assent can be inferred from acts that furthered the conspiracy's purpose." *United States v.*

4

*Miller,* 693 F.2d 1051, 1053 (11th Cir. 1982) (quotation omitted).

In order to convict someone of stealing or misapplying funds from an organization receiving federal assistance, the government must prove: 1) the defendant converted property owned by, or under the care, custody, or control of an organization receiving federal assistance; 2) the defendant was an agent of such an organization; 3) that property was valued at $5,000 or more; and 4) the organization received in excess of $10,000 in federal funds during the 1-year period in which the defendant converted the property. 18 U.S.C. § 666(a)(1)(A); *Tampas*, 493 F.3d at 1298. The statute defines an "agent" as one who is "authorized to act on behalf of another" and, "in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1); *United States v. Langston*, 590 F.3d 1226, 1233-34 (11th Cir. 2009).

"The elements of wire fraud under 18 U.S.C. § 1343 are (1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts reasonably calculated to deceive persons of ordinary prudence." *Id.* at 1270-71 (citations omitted). An interstate

5

wire transmission is "for the purpose of executing" the scheme to defraud if it is "incident to an essential part of the scheme" or "a step in the plot." *Id.* at 1272-73 (quotations omitted).

In order to convict someone of misapplying funds as a credit union employee, the government must prove: 1) the defendant was an employee of the credit union, 2) he willfully misapplied funds intrusted to the credit union's care, 3) he acted with intent to injure or defraud the credit union, and 4) the credit union's accounts were insured by the National Credit Union Administration Board. 18 U.S.C. § 657; *see United States v. Payne*, 750 F.2d 844, 855 (11th Cir. 1985) (setting forth the elements of misapplying bank funds under 18 U.S.C. § 657).

The evidence was sufficient for a reasonable jury to conclude that Telfair, who was the President of FAMU FCU, knowingly and willfully stole at least $134,000.00 in grant funds belonging to FAMU, which FAMU had entrusted to the care of FAMU FCU, and further, that Telfair conspired with his codefendant to steal those funds and to commit wire fraud.

The evidence showed that the grant documents provided for consulting services with FAMU FCU, not with any individual consultant, and that HUD approved FAMU FCU as the vendor and the custodian of the MLP under the grant

6

agreement. FAMU's purchasing director and general counsel approved and officially executed the CSA, which provided for the $150,000.00 payment at issue, based upon their belief that the agreement was with FAMU FCU, not Telfair. Although the CSA listed Telfair as the payee, there was testimony that, because Telfair was the President of FAMU FCU, he would have been the person to sign the contract on behalf of FAMU FCU. After checking the grant documents for compliance, Toletha Sylvester Harris approved a requisition order for a payment of the $150,000.00 to FAMU FCU. Dr. Gray-Ray, who had approved and signed the CSA, completed a purchase exemption for "Contractual services with FAMU Federal Credit Union." Thereafter, FAMU issued a check made payable to FAMU FCU, not Telfair, for $150,000.00, which Telfair endorsed on behalf of FAMU FCU and deposited into the "CCEDI-FAMU Urban Policy Grant" account. The evidence showed that the account had been used as a depository for grant funds, including funds used to secure micro-loans under the MLP. There was no evidence of any other account which also held FAMU's grant funds.

The evidence further showed that, after Telfair deposited the $150,000.00 check into the grant account, he withdrew $15,000.00, or 10% of the deposit, as his fee for administering the MLP, and deposited it into his personal bank account. The ten percent fee was provided for in the CSA, as well as the agreement under

7

which FAMU FCU had administered the MLP under the prior HUD grant. The evidence showed that Telfair always withdrew an amount equivalent to roughly ten percent of each of the grant deposits, which was consistent with the administrative fee the parties had agreed to. Telfair did not claim the $150,000.00 on his income tax return in 2004, 2005, 2006, 2007, or 2008. Based on this evidence, it was reasonable for the jury to conclude that the $150,000.00 at issue belonged to FAMU and not Telfair.

Furthermore, although Telfair claims that FAMU made a mistake when it issued the check to FAMU FCU instead of him individually, he did not ask FAMU to re-issue the check in his name so that he could deposit the money into his personal Morgan Stanley account, as he had done previously with the legitimate fees he received for administering the MLP. Also, Telfair waited almost four years before attempting to access the funds, after McGill, the individual who signed the CSA on behalf of FAMU, had pled guilty to criminal conduct relating to her mismanagement of grant funds. Finally, as discussed below, the evidence supported that instead of just withdrawing the money Telfair claimed already belonged to him pursuant to the CSA, as discussed below, Telfair conspired with Nixon to draft three fraudulent "contracts" in order to facilitate and conceal their scheme to steal the grant money remaining in the account. Based on this

8

evidence, it was reasonable for the jury to conclude that the $150,000.00 at issue belonged to FAMU and not Telfair.

The evidence was also sufficient for a reasonable jury to find that Telfair and Nixon conspired to steal and actually stole approximately $134,000.00 in grant funds belonging to FAMU. Although, as discussed above, the evidence supported that the $150,000.00 in the CCEDI-FAMU account at issue did not belong to Telfair, the evidence also showed that, from 2004 to 2008, Telfair caused the TIN on the CCEDI-FAMU grant account to be changed multiple times, with the final TIN being his own SSN. He also altered the signature cards for the account, eventually listing himself and Nixon as the authorized signors, which gave them the ability to write checks to one another until they depleted the account's funds. Even though Telfair and Nixon, as signors on an account bearing their SSNs, had gained access to the funds in the CCEDI-FAMU account, the evidence showed that they drafted multiple false contracts in an attempt to facilitate and conceal their theft of the remaining grant funds in the CCEDI-FAMU account.

On June 24, 2008, Telfair signed an agreement with Nixon, who signed on behalf of the Institute, which purported to entitle Telfair to seven percent of the funds remaining in the CCEDI-FAMU account. Pursuant to his agreement with

9

the "Institute," Telfair was to continue administering the MLP, and he was to provide several listed documents related to the MLP. However, the evidence showed that (1) the grant was closed on November 28, 2006, and there were no new grant funds; (2) the last loan check under the Institute's MLP was distributed on August 21, 2007; and (3) Telfair had already provided the same MLP documents under two previous contracts. The evidence showed that Telfair then e-mailed Nixon another copy of the June 24, 2008 contract, reflecting a change in the contract's payment terms from seven, to five percent, of the account balance. The e-mail also contained a post-dated invoice in which Telfair purported to bill the Institute for his administration of the MLP through June 30, 2008. Thereafter, on June 28, 2008, Nixon wrote Telfair a check representing five percent of the CCEDI-FAMU account balance, pursuant to the invoice under the new contract. Ultimately, Nixon wrote Telfair two checks from the "CCEDI-FAMU Urban Policy Grant" account, which together totaled an amount exactly equal to seven percent of the balance of the grant account. Based on this, the evidence was sufficient for a reasonable jury to conclude that Telfair and Nixon created a false contract with the Institute, as well as an invoice pursuant to the "contract," in order legitimize Telfair's theft of funds he knew belonged to FAMU. Moreover, if the money already belonged to Telfair under the CSA, as he asserts on appeal, he

10

would not have needed to create the contract under which he invoiced the Institute in order to "justify" his taking the funds

The evidence further supported that Telfair and Nixon created two more fraudulent contracts in an attempt to facilitate and conceal their theft of funds they knew belonged to FAMU. The evidence showed that, at some point, Telfair and Nixon signed the "addendum" referring to Telfair and Nixon as "plan administrators" and providing that they were "responsible for the day-to-day administration of the Micro-Loan Program as independent contractors," for which they were "eligible to collect administrative fees from the balance remaining." Also, in November 2008, Telfair and Nixon signed a "personal services contract," under which Nixon was to work in conjunction with Telfair to monitor the existing MLP and develop new programs. Payment for these services was to come from "administration and/or pool funds remaining after the liquidation of any loan offsets, charge-offs." Approximately 1 month later, Telfair and Nixon wrote checks to one another for $60,067.55, which they each deposited into their personal bank accounts.

The evidence supported that these contracts involved (1) duplication of products and services, which were largely unnecessary, or had already been completed or authorized under previous contracts; (2) payment of an amount that

11

was inconsistent with the value of the services provided; and (3) vague obligation and payment terms. Accordingly, taking the evidence in the light most favorable to the government, the evidence was sufficient for a reasonable jury to conclude that Telfair and Nixon conspired to steal and actually stole at least $134,000.00 in grant funds belonging to FAMU. Moreover, as discussed above, if the money remaining in the CCEDI-FAMU account already belonged to Telfair under the CSA, as he argues on appeal, Telfair and Nixon would not have had to draft these "contracts" in an attempt to establish their right to the funds.

As to Telfair's argument that the government failed to prove certain elements of each of the crimes charged, as discussed below, the record indicates that there was sufficient evidence as to each of those essential elements such that a reasonable jury could find that Telfair was guilty beyond a reasonable doubt.

As to the conviction for conspiracy to steal funds from FAMU, Telfair's argument that he could not conspire to steal funds that belonged to him fails because, as discussed above, the evidence was sufficient for a reasonable jury to conclude that the funds at issue did not belong to Telfair. Moreover, as previously discussed, there was sufficient evidence that Telfair and Nixon conspired to create contracts purporting to establish their entitlement to funds that they knew did not belong to them, and that they wrote checks to one another in order to obtain those

12

funds.

As to Telfair's argument that the evidence was insufficient to prove that he conspired with Nixon to commit wire fraud, the evidence showed that Telfair sent two e-mails to Nixon in order to facilitate the fraudulent scheme to steal FAMU's funds. As discussed above, the first e-mail transmitted the fraudulent June 24, 2008, contract and the invoice billing the Institute for Telfair's services, through which Telfair and Nixon attempted to legitimize their theft of FAMU's grant funds. Additionally, in the second e-mail, Telfair asked Nixon for the FAMU Small Business Development Center's TIN, with which Telfair also sought to legitimize his fraudulent activity. Accordingly, these e-mails were sufficient evidence on which a reasonable jury could conclude that Telfair conspired with Nixon to commit wire fraud, as he caused to be transmitted in interstate commerce communications by wire for the purpose of executing a fraudulent scheme to steal funds belonging to FAMU. 18 U.S.C. § 1343.

As to Telfair's conviction for stealing funds belonging to FAMU, the evidence was sufficient for a reasonable jury to conclude that the funds belonged to FAMU. Contrary to Telfair's assertions, as previously discussed, the evidence was sufficient to establish that the $150,000.00 belonged to FAMU, as opposed to any other entity, including Telfair. Taking the evidence in the light most favorable

13

to the government, HUD originally awarded the grant money to FAMU. Pursuant to the grant agreement, FAMU contracted with FAMU FCU to establish the MLP. Then, FAMU entrusted FAMU FCU with the funds in order to secure loans FAMU FCU provided under the MLP. The $150,000.00 check at issue was drawn from FAMU's account, and it was deposited into FAMU's grant account at FAMU FCU. There was no evidence that the $150,000.00 was used to cover defaulted micro-loans such that FAMU FCU was entitled to the money, and as previously discussed, sufficient evidence supported that Telfair and Nixon in fact stole the funds in question. Accordingly, the evidence was sufficient for a reasonable jury to find that the funds rightfully belonged to FAMU, which had entrusted the funds to the care of FAMU FCU before the funds were stolen.

As to Telfair's argument that the government failed to prove that he was acting as an agent of FAMU, the argument fails because the evidence supported that (1) Telfair was authorized to act on behalf of FAMU in administering the MLP, including using FAMU's money to secure micro-loans which Telfair informed loan recipients were FAMU micro-loans; (2) Telfair held himself out as the administrator of the MLP for FAMU; (3) Telfair was authorized to sign and did sign a contract on behalf of FAMU for the virtual incubator, wherein Telfair was listed as the micro-loan Administrator "representing, and for the benefit of,

14

the INSTITUTE" at FAMU.  Because 18 U.S.C. § 666(d)(1) specifically provides that a representative is an agent, the evidence was sufficient for a reasonable jury to find that Telfair acted as an agent of FAMU.

Regarding Telfair's conviction for stealing funds as a credit union employee, Telfair argues that the government failed to prove that he "knowingly and willfully" stole the funds entrusted to the care of FAMU FCU, because he was contractually entitled to the $150,000.00.   However, as discussed above, there was sufficient evidence on which a reasonable jury could rely to conclude that Telfair was not entitled to the $150,000.00 payment, and further, that he knowingly and willfully stole those funds.  Taking the evidence in the light most favorable to the government, the evidence showed that the $150,000.00 FAMU entrusted to the care of FAMU FCU remained in the grant account, and because Telfair knew that he could not withdraw the funds belonging to FAMU FCU, he conspired with Nixon to draft three contracts purporting to establish Telfair's and Nixon's right to the funds, and then they wrote checks to one another from the grant account.  The evidence supports the conclusion that those contracts would have been unnecessary if the funds already belonged to Telfair, or even if he had a good faith belief that they did.  Instead, Telfair presented to Hursey the "addendum" that he and Nixon had signed in order to try and convince her that the

15

funds were his. Telfair even told Hursey that the grant account was his, after he had changed the account's TIN to his SSN, and caused the account's signature cards to be changed so that he and Nixon could write one another checks from the grant account. Accordingly, the evidence was sufficient to establish that Telfair knowingly and willfully stole money entrusted to FAMU FCU.

Additionally, the evidence was sufficient to establish that Telfair intended to injure or defraud FAMU FCU, as the evidence showed that FAMU FCU approved of Telfair's administration of the MLP, and his receipt of fees, but not of his theft of over $134,000.00 in grant funds FAMU had entrusted to its care. Accordingly, the evidence was sufficient for a reasonable jury to conclude that Telfair's knowing and willful theft of funds entitled to FAMU FCU's care was consistent with an intent to injure and defraud. Accordingly, we affirm as to this issue.

Because the evidence was sufficient for a reasonable jury to conclude that the $150,000.00 did not belong to Telfair, and that he and Nixon conspired to steal and actually stole at least $134,000.00 from the grant account, this Court should affirm as to this issue.

**II.    The loss amount attributed to Telfair at sentencing under**

**U.S.S.G. § 2B1.1(b)(1)**

Regarding the amount of loss attributed to him at sentencing, Telfair argues that the actual loss should have been $32,179.66, which represents the $150,000.00 in grant funds at issue, minus $51,149.62 for legitimate withdrawals, and $66,670.72 for funds Telfair and his codefendant pledged towards restitution. Accordingly, because the loss amount should have been $32,179.66, there should only have been a 6-level increase to his base offense level under § 2B1.1(b)(1), instead of the 10-level increase the district court applied.

We review the district court's fraud loss calculation at sentencing for clear error. *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001). Pursuant to U.S.S.G. § 2B1.1(b)(1), if the loss amount from a fraud was more than $120,000.00, but not more than $200,000.00, the offense level is increased by 10 levels. The district court must make a reasonable estimate of the loss amount, which is the greater of the actual loss or the intended loss. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1343 (11th Cir. 2009) (citing U.S.S.G. § 2B1.1, comment (n.3(A))). The Guidelines define the "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment. (n.3(A)(i)). In calculating the loss amount, the commentary to § 2B1.1 states that the loss shall be reduced by "[t]he money returned, and the fair market

17

value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). The district court's estimate of the loss need only be reasonable. *Renick*, 273 F.3d at 1025; U.S.S.G. § 2B1.1, comment. (n.3(C)). Because the sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence, the district court's loss determination is entitled to appropriate deference. *See* U.S.S.G. § 2B1.1, comment. (n.3(C)); *see also United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999).

Here, the district court did not clearly err when it determined that Telfair was responsible for an actual loss between $120,000.00 and $200,000.00, and thus, that the 10-level enhancement was appropriate. Based on the findings of the jury, which as previously discussed, were supported by sufficient evidence, as well as the PSI and the evidence presented at sentencing, the district court's determination of the loss attributable to Telfair is a reasonable estimate of the loss, and thus not clearly erroneous.

First, as discussed above, the evidence supports the district court's finding that Telfair and Nixon stole at least $134,000.00 in grant funds belonging to FAMU, as they knowingly deposited 4 checks from FAMU's grant account,

18

totaling approximately $134,000.00, into their own personal bank accounts, even though they knew that they were not entitled to the money. Next, the evidence supports the finding of the district court that a total of at least $300,000.00 in grant funds was deposited into the account, all of which Telfair and Nixon could have stolen. As such, the district court properly rejected Telfair's assertion that the baseline for calculating the loss amount was the $150,000.00 check Telfair argued that he was entitled to. Accordingly, the district court properly rejected Telfair's assertion that the loss amount should have been reduced by the amount of legitimate withdrawals from the account, as account funds other than those Telfair and Nixon stole were available to cover those legitimate withdrawals. Moreover, the district court correctly pointed out that the evidence showed that there were cancelled checks in the amount that Telfair and Nixon stole from the account, which was approximately $134,000.00, regardless of whether any other withdrawals were legitimate. Finally, the district court correctly rejected Telfair's assertion that the loss amount should be reduced by the amount Telfair and Nixon pledged in restitution, because the Guidelines suggest that the loss amount shall only be reduced by the money returned *before* the offense was detected. U.S.S.G. § 2B1.1, comment. (n.3(E)(i)). Accordingly, because there is no evidence that Telfair or Nixon returned any money before their offenses were

19

detected, we affirm as to this issue.

### III. The two-level enhancement pursuant to U.S.S.G. § 3B1.3 for abusing a position of trust

Telfair asserts that he should not have received a two-level increase for abusing a position of trust under § 3B1.3, because he did not abuse a position of trust with respect to FAMU, which was the victim in the case. Telfair asserts that any abuse of his position as president of FAMU FCU did not affect FAMU. Further, his position did not aid or conceal his offense. Finally, Telfair argues that the enhancement should not be applied so broadly that it includes every instance of fraud.

We review for clear error a district court's factual determination at sentencing that a defendant abused a position of trust, but we review *de novo* the district court's resolution of the legal issue of whether the defendant's conduct justifies the abuse-of-trust enhancement. *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998). A defendant is subject to a two-level enhancement of his offense level at sentencing if he "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A position of trust is characterized by professional or managerial discretion, and a person occupying a

20

position of trust ordinarily receives less supervision than an employee whose responsibilities are non-discretionary in nature. U.S.S.G. § 3B1.3 comment. (n.1). In order for the abuse-of-trust enhancement to apply, the defendant must have been in a position of trust with respect to the victim of the crime. *Garrison*, 133 F.3d at 837. Thus, the defendant must have "abused discretionary authority entrusted to [him] by the victim." *Id.* at 839 (quotation and emphasis omitted). "The determination of whether a defendant occupied a position of trust is extremely fact sensitive." *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010) (quotation omitted). "The relationship between the defendant and the victim must be more significant than that of an arm's-length business transaction." *United States v. Harness*, 180 F.3d 1232, 1236 (11th Cir.1999). In the fraud context, § 3B1.3 applies where, among other situations, a fiduciary or personal trust relationship exists with another entity or entities and the defendant takes advantage of the relationship to perpetrate or conceal the offense. *Garrison*, 133 F.3d at 837-38.

Here, the district court did not clearly err when it determined that Telfair occupied a position of trust with FAMU, which he used to commit his crimes and conceal them, and thus the two-level enhancement for abuse of a position of trust was appropriate. First, the district court did not clearly err in finding that Telfair

occupied a position of trust with respect to the victim in this case, which was FAMU, because the evidence showed that FAMU gave Telfair discretion to administer and run the MLP, and to disburse its grant funds. The district court also did not clearly err in determining that Telfair's position of trust with respect to FAMU involved a significant amount of managerial discretion, as Telfair was responsible for developing and administering the MLP, including determining who qualified for the micro-loans and actually disbursing FAMU's grant funds. A review of the record also indicates that Telfair was an agent and representative of FAMU, as he had authority to contract on its behalf. Additionally, it appears that (1) Telfair made changes to the account and maintained the records regarding the status of the loans, and (2) as a signatory on the account, Telfair determined whether FAMU's grant money, which was held in an account at the credit union where Telfair was President, would be used to cover defaulted loans. The evidence also showed that FAMU placed such extreme trust in Telfair, despite the concerns of the AGO, that it essentially took him at his word when he told FAMU that the account holding its remaining grants funds actually belonged to him. Thus, the district court did not clearly err in finding that Telfair abused his position of trust with FAMU in order to commit his crimes and conceal them, and it correctly applied the enhancement under § 3B1.3. Accordingly, we affirm as to

this issue.

## Conclusion

The evidence was sufficient for a reasonable jury to find Telfair guilty on each of the charged offenses. Also, the district court calculated a reasonable fraud loss amount, and it did not clearly err in concluding that the two-level enhancement for abuse of a position of trust was appropriate in this case. Accordingly, we affirm Telfair's convictions and sentences.

**AFFIRMED.**